# Petition of Green Mountain Power Corporation

[305 A.2d 571]

No. 168-72

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed April 26, 1973

*Paul, Frank & Collins,* and *Paul D. Sheehey, Esq.,* Burlington, for Green Mountain Power Corporation.

*Robert A. Mello, Special Counsel,* for Vermont Public Service Board.

*Charles R. Ross, Esq.,* Hinesburg, for the Public.

*Ray R. Dinwiddie,* Winooski, *pro se.*

**Daley, J.** This case was commenced on May 13, 1971, when Green Mountain Power Corporation filed a petition with the Public Service Board in which it proposed a proportionate increase in all of its retail rates, except rates for street and area lighting, effective June 12, 1971. Under the rate schedule proposed by Green Mountain, the increase would have added an estimated $2,500,000 or 17.85% annually to Green Mountain's operating revenues subject to the jurisdiction of the Board.

Before the rate schedule proposed by Green Mountain became effective, it was suspended by the Board in a temporary order pursuant to the provisions of 30 V.S.A. § 227. In its temporary order the Board further ordered an investigation into the rate change proposed by Green Mountain, and public hearings.

Green Mountain serves approximately 46,000 customers in an area roughly 25 miles wide and 90 miles long, extending across north central Vermont, and, in addition, it also serves four noncontiguous areas in southern and southeastern Vermont. It also sells and transmits power to six municipal and two cooperative systems; however, the rates applicable to those wholesale customers are not involved in this case.

The two major factors prompting Green Mountain to request an increase in rates were the increased cost of fuel, and the rising cost of money. These two factors have had an unusually large impact upon Green Mountain because of its high rate of growth and because of its large proportion of purchased power. For a five year period ending March 31, 1971,

its sales have grown from 391,946 MWH in 1965 to 828,967 MWH in 1971. During the same period, Green Mountain added only a small amount of generating capacity, and at the time this petition was heard by the Board, it purchased 87% of its power requirements.

At a pre-hearing conference held on September 3, 1971, procedures to govern the proceeding were established, and a test year of April 1, 1970, through March 31, 1971, was agreed upon. Notices of the hearings on the petition were sent and several hearings were held throughout the remainder of 1971.

Upon the passing of six months from the effective date of the proposed increase in rates, the suspension of the increase ordered by the Board in its temporary order expired. On December 21, 1971, the proposed rate schedule was put into effect by Green Mountain, as permitted by 30 V.S.A. § 226, and pursuant to a bond approved by the Board subject to refund within thirty days of the Board's final determination of this case.

Proposed findings and replies thereto were filed by both the public and Green Mountain early in 1972. In response to these requests, the Board, on April 12, 1972, made its findings of fact and its order granting Green Mountain an increase in its rates. Requests for reconsideration of the Board's April 12, 1972, findings and order were then filed by Green Mountain, the public, and one Ray Dinwiddie. Further supplemental findings were then made by the Board on May 3, 1972, and on July 19, 1972.

The rate increase granted by the Board to Green Mountain provided it with annual additional retail revenues in the amount of $2,016,344. For most of the various classes of customers this meant an increase of 14.3% over the existing rates; however, large residential and commercial space heating users received an increase of 23%, and Limited Power F a 21% increase. At the time the findings were made, the percentage increase to Power Rate 14 could not be accurately stated.

The rate increase granted by the Board to Green Mountain was premised upon its finding that Green Mountain had jurisdictional operating revenues for the test year of $14,603,627, operating expenses apportionable to retail customers of

$13,577,953, a jurisdictional rate base of $30,441,233, and a rate of return of 8.24%.

Although not requested by Green Mountain, the Board granted Green Mountain an automatic fuel adjustment clause. The Board also fashioned a new rate design for Green Mountain's electric heating customers which had the effect of causing them to bear a proportionately greater share of the cost of electric power than they had in the past. Finally, the Board certified the rate increase was consistent with the goals and purposes of the Economic Stabilization Program.

The public and Ray Dinwiddie have taken this appeal from the decision of the Board reported at 94 P.U.R.3d 417 (1972). Counsel for the public has secured from the Board fifty-nine questions, six of which have been briefed. Mr. Dinwiddie has briefed three questions. We shall in the course of this opinion take up the claims of the appellants which have been briefed; however, those questions not briefed are waived. *Swanton Village* v. *Town of Highgate,* 128 Vt. 401, 403, 264 A.2d 804 (1970).

## FUEL ADJUSTMENT CLAUSE

The Board based its finding that a fuel adjustment clause would be appropriate here in part upon the testimony of an expert witness for the public, John W. McCabe, III. The Board found the clause to be appropriate because Green Mountain was in a period of drastically fluctuating fuel costs and uncertain fuel supply. In permitting a fuel adjustment clause, the Board also noted that while it did not generally approve automatic clauses of any kind, it had done so in the recent case of Central Vermont Public Service Corporation, reported at 94 P.U.R.3d 34 (1972). Opportunity was provided by the Board for other parties to comment on any such clause filed by Green Mountain, and the clause was made subject to final Board review and approval.

The public, in its motion for reconsideration, objected to the clause filed by Green Mountain and set forth its objections in considerable detail. These objections were responded to by the Board in its supplemental findings of July 19, 1972, and the clause proposed by Green Mountain was approved.

In general terms, the fuel adjustment clause approved by the Board for Green Mountain provides for an upward or downward adjustment of all rates corresponding to any increase or decrease in the cost of fuel from a base cost. The base cost for the purpose of computation of the fuel adjustment was taken as the costs during March, 1971, and, in the case of sources added since that date, the cost was that during the first month in which the source was used. The adjustment applies to the cost of fuel for thermal electric generating equipment, whether such fuel is used by Green Mountain in its plants, or by other utilities in the generation of electricity purchased by Green Mountain, provided such fuel costs can be identified as a specific charge to Green Mountain by the supplier.

The question pertaining to the fuel adjustment clause as framed by the public and certified by the Public Service Board pursuant to V.R.A.P. 13(d) for review by this Court is:

"Whether the adoption of a fuel adjustment clause in this case is supported by substantial evidence and is just and reasonable as required by 30 V.S.A. § 218?"

At the outset we, as a reviewing Court, must establish what standard we are to apply when we view findings of fact made by the Public Service Board. The standard we previously applied, that being to accord the findings of fact, the force and effect of a special master has been amended. *Cf. North* v. *City of Burlington Electric Light Department,* 125 Vt. 240, 214 A.2d 82 (1965). The present standard is now set forth in 30 V.S.A. § 11(b) as follows: "Upon appeal to the Supreme Court its [the Board's] findings of fact shall be accepted unless clearly erroneous." This is the same standard of review which applies to findings of fact of a trial court under V.R.C.P. 52(a). *Green Mountain Marble Co.* v. *State Highway Board,* 130 Vt. 455, 457, 296 A.2d 198 (1972). As such, our standard of review varies from the substantial evidence standard applied by the federal courts when they review administrative proceedings. Compare *Gainesville Utilities Department* v. *Florida Power Corporation,* 402 U.S. 515 (1972), with 4 K. Davis, Administrative Law Treatise § 29.02, at 121 (1958).

In a rate proceeding the powers and duties of the Public Service Board are set forth in 30 V.S.A. § 218, which provides in part:

> "When, upon hearing, the rates, tolls, charges or schedules are found unjust, unreasonable, insufficient or unjustly discriminatory, or are found to be preferential or otherwise in violation of a provision of this chapter, the board may order and substitute therefor such rates, tolls, charges or schedules, and make such changes in any regulations, measurements, practices or acts of such company relating to its service, and may make such order as will compel the furnishing of such adequate service as shall at such hearing be found by it to be just and reasonable."

In fulfilling this responsibility, it is the duty of the Board to first find that the present rate is unjust or unreasonable, and then it is the duty of the Board to make such changes as it finds will make the rates just and reasonable. *Petition of Milton Water Corp.*, 125 Vt. 487, 492, 218 A.2d 710 (1966).

A review of the testimony elicited from public's witness McCabe by counsel for the public offers considerable light on the basis for the Board's finding that a fuel adjustment clause was just and reasonable in view of the circumstances present in Green Mountain's situation. Mr. McCabe, a public utilities consultant experienced in the operation of fuel adjustment clauses, testified the Boston Edison system, the principal supplier of Green Mountain's power, had invoked a fuel adjustment clause during the test year with respect to the energy it supplied to Green Mountain. The energy charge for electricity supplied to Green Mountain by Boston Edison had been increased from 4.5 mils per kilowatt hour to 7.29 mils per kilowatt hour at the end of the test year. Mr. McCabe attributed this increase to the increased cost of fuel purchased by Boston Edison, and the fact the City of Boston had instituted a low sulfur requirement of 1% for fuel burned there. Mr. McCabe also indicated the City of Boston would institute a sulfur requirement of ½% in the period following the test year. Another factor considered by Mr. McCabe to have a bearing on the necessity for a fuel adjustment clause was the

fact that the fluctuating cost of fuel could render any revenues based upon the test year inadequate if the cost of fuel went up; or conversely, if the cost of fuel went down the revenues would be excessive.

In his review of what should be reflected in a fuel adjustment clause for Green Mountain, Mr. McCabe testified any such clause should be drafted so as to take into consideration both increases and decreases in the cost of fuel. He also testified such a clause should not encompass energy produced by atomic or hydro facilities now in existence or coming on line at some point in the future.

Witness McCabe concluded his testimony by recommending what he referred to as a purchase power adjustment clause when he stated:

> "I normally hesitate to gear cost increases or decreases to one particular item of cost within a company's total cost of service, but in this case I think that it would be appropriate, particularly since they are subject to a fuel adjustment clause of their major purchase [sic] of power. . . ."

Having first found a fuel adjustment clause to be just and reasonable in view of the circumstances then present, the Board next proceeded to allow Green Mountain to propose a clause. Opportunity was also provided for the other parties to comment upon the clause filed by Green Mountain before it was approved by the Board.

The public, in its motion for reconsideration, objected in considerable detail to the clause proposed by Green Mountain, and proposed a clause of its own. These objections were responded to by the Board in its supplemental findings and the two proposed clauses were compared before the clause proposed by Green Mountain was approved as being a just and reasonable addition to Green Mountain's rate tariff.

The arguments for and against fuel adjustment clauses are well summarized in *Re: Southern California Edison Company,* 94 P.U.R.3d 252, 256–62 (1972), and from them one cannot help but reach the conclusion that such clauses are to be only approved with caution. The public argues the clause approved by the Board fails to encourage hard bargaining on the part

of Green Mountain, and in support of this position the public relies upon *Re: Union Electric,* 92 P.U.R.3d 254 (1971), where a commission rejected a fuel adjustment clause. The clause proposed by Union Electric would have passed on to the public only increases in the costs of coal used to generate electrictiy in its own plants, while providing no way for the Missouri Public Service Commission to determine if the increased charges were warranted.

However, the circumstances in the case at bar are far different from those in Union Electric, for here Green Mountain purchases some 87% of its power requirements from other companies, and as a consequence, it has no control over the source of fuels purchased by its suppliers. The clause adopted by the Board in the case at bar provides for both an upward or downward adjustment, while that rejected by the Commission in *Re: Union Electric, supra,* only provided for an upward adjustment. But most importantly, the Board stated that Green Mountain would have to notify it in advance before any increase could take effect, and the Board would review the basis for any such increases. For these reasons, we can see a clear distinction between *Re: Union Electric, supra,* and this case.

In its brief the public contends the decision of the Board to invoke a fuel adjustment clause is based upon insufficient evidence because the Board failed to adhere to the essentials of due process and adopted the clause without providing the public with any real opportunity to be heard.

In the field of administrative regulation the essentials of due process must be met if a fair and open hearing is to be provided by the Board. *Petition of New England Tel. & Tel. Co.,* 120 Vt. 181, 188, 136 A.2d 357 (1957) ; *Morgan v. United States,* 304 U.S. 1 (1938). The question on review is not the adequacy of the original notice or pleading but is the fairness of the whole procedure. Critical to a determination of whether the procedure was fair is whether or not the parties were given an adequate opportunity to prepare and respond to the issues raised in the proceeding. 1 K. Davis, Administrative Law Treatise § 8.04, at 525 (1958).

Green Mountain proposed a purchase power adjustment clause to the Board shortly before filing its petition for an

increase in rates and withdrew the proposal following discussions with the Board's staff. Then in its petition for an increase in rates Green Mountain did not request a fuel adjustment clause. As a consequence of these two events, one could be easily led to believe a clause would not be placed in issue by the Board or Green Mountain. Unfortunately, that did not prove to be the case, and after hearing testimony on the need for a fuel adjustment clause, the Board in its findings decided to allow Green Mountain to propose one. Green Mountain proposed a clause and the Board provided the public with an opportunity to comment upon the clause. The public took this opportunity in its motion for reconsideration, and the Board responded to the public's objections setting forth its reasons for not adopting the clause proposed by the public and approving the clause submitted by Green Mountain.

■ While it would have been highly desirable for the Board to have given notice to all the parties as soon as it became apparent a fuel adjustment clause would become an issue in the proceeding, we cannot say that on the record before us the public was denied the opportunity to be heard on both the need for a clause and its provisions.

■ We conclude the Board properly discharged its function under 30 V.S.A. § 218 when it approved the use of a fuel adjustment clause by Green Mountain.

## RATE OF RETURN

A. Cost of Capital

■ In order to determine whether a particular utility's rate is just and reasonable, a decision must be made on each of four underlying factors: (1) Gross earnings; (2) Operating expenses; (3) Rate Base—the net value of the property upon which a return should be earned; (4) The rate of return. *Latourneau v. Citizens Utility Company*, 125 Vt. 38, 48, 209 A.2d 307 (1965); *Petition of New England Tel. & Tel. Co.*, 120 Vt. 181, 190–91, 136 A.2d 357 (1957). The necessary determinations were made by the Board in the case at bar, and only the rate of return is challenged in this appeal.

During the course of this proceeding, it has been the public's position there should be excluded from the embedded cost

of capital of Green Mountain, $5,600,000 of the company's long-term debt, and $750,000 of its outstanding preferred stock when the rate of return is determined. The public excluded the long-term debt and preferred stock from the embedded cost of capital because the funds provided by those issues were invested in Vermont Yankee Nuclear Power Corporation (Vermont Yankee), and the public contends Vermont Yankee is a non-utility asset which Green Mountain's present customers should not be forced to pay for.

The rate of return found by the Board to be proper for Green Mountain was 8.24%, and the Board's computations giving rise to this return are summarized in the following table:

CAPITAL STRUCTURE AS DETERMINED BY THE BOARD

| | Amount of Capital | Percent of Total Capital | Annual Cost (Rate) | Return on Total Capital (Cost Components) |
|---|---|---|---|---|
| Long-term Debt | $26,794,000 | 54.81% | 5.99% | 3.28% |
| Preferred Stock | 3,376,000 | 6.91 | 5.77 | .40 |
| Common Equity | 14,070,000 | 28.78 | 13.80 | 3.97 |
| Short-term Debt | 4,644,000 | 9.50 | 6.25 | .59 |
| Total | $48,884,000 | 100.00% | | 8.24% |

Under the revised capital structure proposed by public's witness Bernstein, a rate of return of 6.93% was determined to be proper for Green Mountain. This rate of return is summarized as follows:

CAPITAL STRUCTURE AS PROPOSED BY THE PUBLIC

| | Amount of Capital | Percent of Total Capital | Annual Cost (Rate) | Return on Total Capital (Cost Components) |
|---|---|---|---|---|
| Long-term Debt | $14,532,100 | 43.99% | 4.71% | 2.07% |
| Preferred Stock | 2,794,650 | 8.46 | 5.52 | .47 |
| Common Equity | 10,136,944 | 30.69 | 11.00 | 3.38 |
| Short-term Debt | 5,569,100 | 16.86 | 6.00 | 1.01 |
| TOTAL | $33,032,794* | 100.00% | | 6.93% |

* To arrive at this figure Mr. Bernstein also excluded an additional $5,858,240 on a proportionate basis in order to equate capitalization with the rate base proposed by Green Mountain; however, this adjustment is not the one that significantly affects the cost of capital.

As can be seen from the computations, the elimination of the cost of Vermont Yankee from the embedded cost of capital of Green Mountain results in a significant difference in the capitalization ratios. As a consequence of the difference in the capitalization ratios, the rate of return allowed by the Board is significantly higher than that proposed by the public's witness, Bernstein. See J. Bonbright, Principles of Public Utility Regulation 240–56 (1961).

In support of its contention that Vermont Yankee is a non-utility asset for which the capital costs of should be excluded from the cost of capital of Green Mountain, the public relies upon *Re: Mountain Fuel Supply Co.*, 76 P.U.R.3d 277 (1968); *Re: Intermountain Gas Co.*, 86 P.U.R.3d 438 (1970); and *Re: Pacific Power and Light Co.*, 86 P.U.R.3d 417 (1970).

The Utah Public Service Commission in *Re: Mountain Fuel Supply Co., supra,* 76 P.U.R.3d at 312, excluded the amounts the applicant, a gas company, invested in oil and mining operations when it determined the applicant's rate base as part of a request by the applicant for an increase in its rates. The Utah Public Service Commission reached this conclusion after it found the oil and mining operations to be a non-utility business.

In *Re: Intermountain Gas Co., supra,* the Idaho Public Utilities Commission excluded from the cost of capital that amount which the applicant had invested in such non-utility endeavors as an appliance lease-rental program and the operation of a farm. In excluding these costs the Commission in *Re: Intermountain Gas Co., supra,* 86 P.U.R.3d at 442–43, noted it had no control over the non-utility investments as they were beyond its jurisdiction.

In a case most helpful to an understanding of the one at bar, the Oregon Public Utility Commissioner in *Re: Pacific Power & Light Company, supra,* was presented with a situation in which the utility company, together with others, was constructing a fossil fuel plant known as the Centralia plant. The utility company financed its share of Centralia through the issuance of bonds, and it sought to include this cost as a part of its cost of debt when computing its embedded cost of capital. However, the Commissioner found the utility did not need the energy the Centralia plant generated and had

contracted for the disposition of the energy produced by the plant. For these reasons, the Commissioner in *Re: Pacific Power & Light Co., supra,* 86 P.U.R.3d 429–30, held the Oregon ratepayer should not be burdened with the capital costs of the Centralia project until the plant is used for the benefit of the ratepayer. The Commissioner also noted that during the period the energy was contracted away the company would recover its costs and earn a return on its investment.

From the above cases it can be seen non-utility costs are excluded from the cost of capital in rate proceedings because they are not a regulated activity over which the Board has control. Moreover, it can also be seen the activities found to be non-utility activities were not activities which the regulated company devoted to a public service. See also *El Paso Natural Gas Co.* v. *Federal Power Commission,* 449 F.2d 1245, 1249–51 (5th Cir. 1971). In comparison, Vermont Yankee was found by the Board to be an electrical generating facility which was planned to be an integral part of the power supply of Vermont and as such is not unrelated to Green Mountain's providing service. In addition, the Board reviewed each of Green Mountain's security issues issued to finance Vermont Yankee and found them to be consistent with the general good of the state at the time they were issued.

But, most important to the case at bar, the determination made in *Re: Pacific Power & Light Co., supra,* points out that in order for the cost of capital of a power plant to be excluded from that company's total embedded cost of capital, it must be shown the plant is not used for the benefit of the ratepayer, and provision has been made for a return on the cost of the security issues from another source. In contrast, Vermont Yankee was constructed to be of direct benefit to Green Mountain's customers, and no other provision has been made to provide a return on the cost of those issues issued to finance Green Mountain's share of Vermont Yankee. Indeed, if the cost of the security issues issued by Green Mountain to finance Vermont Yankee is not allowed here, it will not be repaid.

For the foregoing reasons, we conclude the decision of the Board to include the capital costs incurred by Green Mountain to finance its share of Vermont Yankee in Green Mountain's

embedded cost of capital was proper. However, it should be noted these security costs were not applied to Green Mountain's rate base, as Vermont Yankee will have its own rate base.

## B. Rate of Return on Equity

It is the public's contention that the record in no way substantiates the finding of the Board that Green Mountain should be entitled to a return on equity of 13.8%. Rather, the public argues, the return on equity should be on the order of 10.5% to 11.0%.

■■■■■ The fundamental considerations involved in finding a fair rate of return were first enunciated in *Bluefield Water Works and Improvement Co.* v. *Public Service Commission,* 262 U.S. 679, 692–93 (1923). They are:

> "A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time, and become too high or too low by changes affecting opportunities for investment, the money market, and business conditions generally."

These considerations were followed in *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U.S. 591, 603 (1944), and have been consistently followed by many cases, in many jurisdictions, including Vermont. *Petition of Letourneau* v. *Citizens Utilities Co.,* 128 Vt. 129, 133–34, 259 A.2d 21 1969); *Petition of New England Tel, & Tel. Co.,* 120 Vt. 181, 191,

136 A.2d 357 (1957); *Petition of Central Vermont Public Service Corporation,* 116 Vt. 206, 216, 71 A.2d 576 (1950).

More specifically, the public contends the Board committed error when it compared the rate of return on equity it allowed to Green Mountain with that it had allowed to Central Vermont Public Service Corporation in a previous case, and based its finding in part on that comparison. The public maintains this was not a proper comparison, since in no manner does the record show the two utilities to be comparable.

Our review of the record shows the public's contention to be without merit for both the public's witness, and the company's witness considered Central Vermont Public Service Corporation to be a comparable company in their presentations.

The public's witness, Bernstein, utilized Central Vermont Public Service Corporation as one of his comparable companies in his discussion of earnings-price ratios and their relevance. to the rate of return he proposed for Green Mountain. The company's witness, Merrill, also considered Central Vermont Public Service Corporation to be comparable to Green Mountain from the point of view of operations, size, capitalization, and financial integrity when he determined the rate of return on equity Green Mountain was entitled to.

The public also contends the rate of return on equity allowed by the Board cannot be supported on the basis of this record because the Board approved a fuel adjustment clause for Green Mountain. The public argues such clauses serve to reduce the risk of operation, and the Board cannot prove it actually reduced the rate of return on equity to take into consideration the reduced risk. This claim is also without merit, for the Board in its findings of July 19, 1972, stated: "Our determination of the return on equity was made in light of our allowance of the fuel clause."

Shortly before commencing this proceeding, Green Mountain declared an increased dividend for its stockholders, and the public maintains the Board should have considered the reasonableness of this action in deciding on the rate of return it allowed on equity. Our review of the record shows counsel for the public explored this action in depth during his cross-examination of Green Mountain's Vice President in charge of financial matters. As a consequence, all the facts

behind the decision to increase the dividends were placed before the Board for its consideration. In view of the fact these facts were made a part of the record, and the public has made no showing of unreasonableness, we must presume the Board considered this action to be reasonable.

 Under the facts in this case, we conclude the Board's finding of a 13.8% return on equity is substantiated in the record; and the principles enunciated in the *Bluefield* case were adhered to.

## RATE DESIGN

In its petition, Green Mountain proposed to the Board to put into effect a general tariff comprising the proposed new rate schedules on a uniform basis to all classes of retail customers of the company. Excluded from this change were the rates for street and area lighting. Thus, the proposed rate schedules generally followed the existing rate design then in effect.

During the hearings, testimony was received from an expert witness for the public, Allen J. Schultz, concerning the subject of Green Mountain's rate design. This testimony related to the results of a study done by Mr. Schultz from which he made recommendations for changes in the rate design of all the general classes of service—residential, commercial, and industrial.

The data upon which Mr. Schultz's testimony was based first consisted of a table which showed the comparative load characteristics of residential major appliances by setting forth the connected load, the individual customer's maximum demand, and the diversified maximum demand per customer. Witness Schultz explained the significance of this table in considerable detail, and most importantly to him it indicated electric space heating has a relatively high connected load, no individual customer diversity, and about 74% of the total installed capacity is on simultaneously. For these reasons, Mr. Schultz noted electric space heating differs considerably from other residential usages of electricity.

The other data upon which Mr. Schultz relied was provided to him by Green Mountain, and it consisted of a study in which the company had measured the power demand and the

energy consumption of the residences in two subdivisions recently constructed in the territory served by Green Mountain. One subdivision had 11 residences, all electrically heated, while the other subdivision had 62 residences in which only one was electrically heated. This study showed the subdivision with electric heating had an annual load factor of 28.1% while the other subdivision had an annual load factor of 43.7%. From the difference in annual load factors, Mr. Schultz concluded the electric heating customers had a poor load factor. However, at this point Mr. Schultz recognized this data had limitations and stated: "Some caution must be exercised in interpreting this study since the residences may not be typical of the rest of the system."

In spite of the limitations imposed by the study, Mr. Schultz went ahead and made an allocation of the company's cost of service to each group of customers. The results of this study indicated a disproportionately large contribution to the company's return would be made by the domestic customers without space heating, while a disproportionately small contribution to the company's return would be made by domestic customers with space heating if the existing rate design was used.

In view of this conclusion, Mr. Schultz recommended to the Board there was justification for increasing the rates of domestic heating customers by 50%. However, believing such an increase to not be in the public interest, Mr. Schultz recommended a 25% increase for present heating customers, and a 50% increase for future heating customers. With respect to the commercial customers, Mr. Schultz recommended there be no increase in the general rate, an increase in the farm rate proportionate to that in the domestic rate, an increase in the power rate to produce whatever revenues needed, no increase in the electric water heating rate, a minimum bill provision for the commercial space heating service rate, and a pro rata increase for area lighting, street lighting, and public authority customers.

During the course of cross-examination by counsel for Green Mountain, Mr. Schultz again stressed: "The use that I made of these studies had certain limits on it compared to

what I might have done had I complete [sic] . . . an accurate study." He also admitted the sample was not random, and, as a consequence, the data could not be used in an absolute sense. Finally, Mr. Schultz indicated he had made no study as to whether or not commercial customers using electrical heat such as schools, churches, or small commercial enterprises were contributing their share of revenues.

At the termination of the hearings, the public took the position in its requests for findings of fact that based upon the rather limited data available to Mr. Schultz, it would be in the public interest for the State to make further investigation into the impact of the electric heating load before the Board undertook to re-design Green Mountain's rate structure. Green Mountain took the position that because of the material weakness in Mr. Schultz's study, his recommendations for a change in rate design should not be adopted by the Board.

The Board took no position on the matter of rate design during the hearings and introduced no evidence on the matter. However, in its order of April 12, the Board proceeded to design a new rate structure for Green Mountain, different from that proposed by witness Schultz. At that time the Board began its findings on the matter of rate design by stating it was about to begin a statewide study of the cost of service to the different classes of customers, a recommendation made previously by witness Schultz. Then the Board announced it was convinced from the evidence presented that heating customers have not been paying their way.

The residential rate was designed by the Board so the first three blocks received a 14.3% increase. The tail block was eliminated, and the final rate block was to be no lower than 1.6 cents per KWH. All residential heating customers were to receive a minimum bill charge of $13.00 a month, but this was changed slightly by the Board in its supplemental findings so the average monthly bill of each customer having installed electric heat shall not be less than $13.00 during each year. For a residential space heating customer, this meant a 23% increase; however, this was further explained by the Board in its supplemental findings when it noted a large volume residential customer would pay only a cost of 1.879 cents per KWH, while the small volume residential customer would

pay an average cost of 2.996 cents per KWH under the new rate design.

The Board also designed a new commercial rate structure for commercial heating customers including an increase of 23% when it prescribed that the tail block of the commercial space heating rate be 1.95 cents per KWH and contain a minimum charge of $12.00 per KWH per year of connected heating load. General rate customers were given no increase. The farm rate was eliminated, and farm customers were charged the same rate as residential customers. Area and street lighting, service to public authorities, the electric water heating rate, and cable television were charged an average 14.3% increase. Limited power rate was charged an approximate 21% increase. Finally, the Board changed the power rate to produce whatever additional revenues are needed to equal the increase allowed after giving effect to the other rate modifications, provided special attention was given to raising the tail block.

In this appeal, both the public and Ray Dinwiddie contend the Board was in error when it designed a new rate structure for Green Mountain. More specifically, they contend this error was committed because there was not sufficient evidence on the record to warrant the Board's establishing a new rate design and, in addition, proper notice of the change and an adequate opportunity to be heard was not provided by the Board.

As we previously stated in the section on the fuel adjustment clause, findings of fact made by the Board will be accepted by this Court on appeal unless they are clearly erroneous. 30 V.S.A. § 11(b). In reviewing such findings of fact, we also must accord proper deference to the expert and informed judgment of the Board. *Latourneau* v. *Citizens Utilities Company, supra,* 125 Vt. at 47. When the Board undertakes to examine the rate schedules of a company, it is the duty of the Board to first find that the present design is unjust, unreasonable, insufficient, or unjustly discriminatory and then to make such changes as it finds will make the rates just and reasonable. 30 V.S.A. § 218. Moreover, such findings of fact made by the Board are required to be based exclusively

304 on the evidence and on matters officially noticed by the Board. 3 V.S.A. § 809(g).

In its supplemental findings of fact made on July 19, 1972, the Board gave the evidentiary basis for its change in rate design when it stated: "As explained in our Order of April 12, 1972, we relied not only on the Schultz data, much of which was not challenged, but also upon our knowledge that energy costs are rapidly increasing, with the result that the tail blocks of certain rate schedules are below long-run variable cost." The Board also felt this change in rate design was an effort to move away from a promotional rate design which encouraged power growth.

It can readily be seen the Board drew upon two sources for its finding that Green Mountain's previous rate design was inadequate, and the new rate design it fashioned for Green Mountain was just and reasonable. The first source was Mr. Schultz's data and the second was the Board's own knowledge.

The second source the Board relied upon for its finding represented an attempt by the Board to establish by official notice the fact "that the tail blocks of certain rate schedules are below long-run variable cost." An administrative agency such as the Board has the power to take official notice of judicially cognizable facts provided it follows the proper procedure found in 3 V.S.A. § 810(4), which provides as follows:

"(4) Notice may be taken of judicially cognizable facts. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge. Parties shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material noticed, including any staff memoranda or data, and they shall be afforded an opportunity to contest the material so noticed. The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence."

Assuming the fact officially noticed was judicially cognizable, no notice was given to the parties of the material noticed by the Board before or during the hearings, and, in addition,

the parties were not given an opportunity to contest the material noticed. See *Latourneau v. Citizens Utilities Company, supra,* 125 Vt. at 48–49. Due to the failure of the Board to adhere to the procedure outlined in 3 V.S.A. § 810(4), we as a reviewing body are unable to determine what material the Board relied upon when it attempted to establish this fact by judicial notice. Because of this deficiency, the Board's findings of fact on rate design must by necessity rise or fall solely upon witness Schultz's data.

On review, it is not the function of this Court to require the facts be found in accordance with our view of the evidence, thereby substituting our judgment for the Board. Rather, we will sustain their weighing of the evidence if there is evidence to support it. *Petition of Lyndonville Village,* 121 Vt. 185, 190, 151 A.2d 319 (1959). In this respect it is not for this Court to review the rightness of the Board's findings; rather, it is only for this Court to review the reasonableness of those findings.

We have previously outlined the rather limited nature of witness Schultz's data and have noted this was recognized by Mr. Schultz himself. Nevertheless, as the Board points out in its findings of fact, this is the best evidence on the record. Even if we were to accept the limited study made by Mr. Schultz on the cost of service to domestic customers with and without space heating, we are still faced with the fact there was no study placed on the record on the cost of service to those customers in the commercial and industrial rate blocks, some of whom had rate increases due to the change in the rate design of 23%. Moreover, there were no studies or testimony introduced indicating the cost of service to churches, schools, or small commercial enterprises.

Upon the record before us we can only conclude the Board's findings of fact on the issue of rate design are clearly erroneous by virtue of the fact there is no substantial footing in the evidence for those findings. *Cf. Petition of New England Tel. & Tel. Co., supra,* 120 Vt. at 193. By reason of the foregoing, we need not reach the other issues raised by the public and Ray Dinwiddie in this section, for, on remand, we are certain the Board will take steps to insure that any possible due process problems are eliminated.

## ECONOMIC REGULATION

In this appeal the public has raised two issues in which it contends the Board violated the Economic Stabilization Act of 1970 as amended, and the regulations of the Federal Price Commission. The issues as framed by the public and certified by the Board are:

"Whether the Order violates the Economic Stabilization Act of 1970 and the criteria and guidelines which have been adopted pursuant thereto.

Whether the rate of return is in excess of that properly to be allowed under the Economic Stabilization Act."

 Under Section 211(a) of the Economic Stabilization Act of 1970 as amended by the Economic Stabilization Act Amendments of 1971, P.L. 92–210, 85 Stat. 748–50, exclusive original jurisdiction to hear and grant the relief requested by the public vested in the Federal District Courts of the United States, and, as a consequence, this Court is without jurisdiction to grant the relief requested. Accordingly, we will not respond to those two issues.

## FINDINGS OF FACT

With respect to the findings of fact made by the Board, the public has raised the following issue:

"Whether the Board erred in failing to make required findings as requested by the Public in accordance with 30 VSA 11."

In essence it is the public's position that the Board "ducked" making specific findings on each of the 111 requests for findings filed by the public and because of this the Board did not go on record as to its judgment on existing and prospective practices of Green Mountain which might reduce costs.

 Under the provisions of 3 V.S.A. § 812, the Board is required to rule on each proposed finding of fact submitted by a party in its findings of fact. However, this is not a requirement that the Board, to avoid error, make specific finding on each proposed finding separately. *In re Application of*

*Hemco, Inc.,* 129 Vt. 534, 537, 283 A.2d 246 (1971). *Cf.* 2 K. Davis, Administrative Law Treatise § 16.02, at 438 (1958). A review of the record shows the Board considered and ruled on each proposed finding requested by the public. To require that the Board make a specific finding on each proposed finding would only serve to unduly burden and confuse the Board's decision. Thus, the Board's rulings on the proposed findings of fact are sufficient in law.

## DUTY TO INVESTIGATE

The public here contends the Board, in light of the record evidence, has a duty under 30 V.S.A. §§ 202 and 209(3) to institute an investigation of methods and facilities of operation so as to produce better service and reduced costs, thereby minimizing the likelihood of additional rate increases.

Pursuant to 30 V.S.A. § 202, the Board is designated the principal planning agency of the State for the purpose of obtaining proper utility service at a minimum cost under efficient and economical management. On the other hand, 30 V.S.A. § 209(3) confers jurisdiction on the Board to hear and determine matters respecting the manner of operating and conducting any business subject to the Board's supervision under Chapter 5 of Title 30.

Quite different and distinct from the planning function of the Board under 30 V.S.A. § 202, this case concerns a petition for a rate increase filed by Green Mountain under 30 V.S.A. §§ 218, 225, 226 and 227. In this respect, the public has not established how the planning function of the Board, which is an administrative rather than judicial activity, may be invoked as part of a rate proceeding. On the record before us we cannot say as a matter of law the Board has a duty to investigate any of the long range decisions involving Green Mountain's operations.

In this period of escalating costs and power shortages, the planning function of the Board becomes more critical than before. This function is not a passive one, and, in order it may be fulfilled, the Board has a duty to actively review the operations of the companies subject to its jurisdiction. The affirmative protection that the legislature, through

30 V.S.A. § 202, mandates the Board give the public, requires in part that the Board inform the public of what it is doing to insure the public is receiving proper utility service at a minimum cost under efficient and economical management. Indeed, as have been evidenced by this very appeal, the conditions giving rise to Green Mountain's request for a rate increase are complex and involve long range decisions which the Board has a continuing duty to survey and inform the public of. It is only through the wise and responsible exercise of the Board's duties in this area can the interests of the consumer be effectively balanced against those of the utilities on a long term basis.

*The order of the Public Service Board is affirmed in all respects, except as to the issue of rate design. Cause is remanded to the Board for further proceedings on this issue.*