## Petition of Vermont Electric Generation and Transmission Cooperative, Inc.

[502 A.2d 841]

No. 85-241

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes, JJ.**

Opinion Filed August 14, 1985

Motion for Reconsideration and Reargument Denied October 10, 1985

*Michael L. Burak* and *Jon T. Anderson* of *Goldstein, Manello & Burak*, Burlington, for Plaintiff-Appellant.

*Michael Marks*, Montpelier, for Defendant-Appellee Department of Public Service.

*Thomas J. Kennedy*, St. Albans, for Defendant-Appellee VPIRG.

**Gibson, J.** Vermont Electric Generation and Transmission Cooperative, Inc. (VEG&T) appeals from a decision of the Vermont Public Service Board (Board) denying its petition for approval of long-term financing. In the proceedings before the Board, VEG&T sought permission to convert into permanent,

long-term financing from the Rural Electrification Administration (REA) some $634,000 in short-term borrowings it had accumulated while making payments toward its share of the construction of the Seabrook nuclear power project (Seabrook).

VEG&T contends that the Board's decision must be reversed because (1) it is unsupported by the evidence; (2) the Board gave no notice that it would consider the merits of the Seabrook project herein, but instead had given notice that it would consider that issue in a separate proceeding in which all interested Vermont utilities, including VEG&T, were to participate; (3) the Board provided VEG&T with no opportunity to litigate the issue of whether a default by VEG&T on its obligations to Seabrook was a viable risk; and (4) the Board's findings are inadequate to support its decision. For the reasons stated herein, we reverse.

The hearing examiner found, among other things, that VEG&T requires $634,000 to finance its participation in Seabrook Unit No. 1 for the period between January 1, 1985 and April 16, 1985; that VEG&T has been advised by the National Rural Utilities Cooperative Finance Corporation (CFC), its source of short-term borrowings, that CFC would stop advancing funds if VEG&T did not immediately convert its short-term Seabrook borrowings to permanent long-term debt; that, although "rolling over" short-term debt in this fashion would make available more short-term borrowing capability for VEG&T to use for additional Seabrook progress payments, "VEG&T will not use this financing to increase its obligations associated with Seabrook Unit No. 1."

At the hearing, the Department of Public Service "was unwilling to recommend to the Board a course of action that would precipitate the VEG&T's default upon its Seabrook obligations at this time . . ." and recommended a prohibition of any further short-term financing of Seabrook without prior Board approval. The hearing examiner found that the proposed long-term financing was "consistent with the general good of the State of Vermont."

Subsequently, at oral argument before the Board, the Department argued that the hearing examiner's proposal for decision should be affirmed and that the Board should thereafter require VEG&T to obtain its approval for any renewed short-term borrowings for Seabrook. The Board adopted the hearing examiner's findings of fact; however, it concluded that "further VEG&T long-term financings for Seabrook investments are not in the best

interests .of the State of Vermont, and that they should be denied." The Board stated that the only direct consequence of its ruling was that VEG&T would have to continue to pay short-term rates for the loans then outstanding; it was not persuaded that CFC might cut off further short-term loans if the permanent financing was disallowed. Finally, it concluded "that VEG&T's request to borrow *more money to invest in the Seabrook project* should be denied." (Emphasis added.)

In reviewing this matter, it is important to consider the context in which it arose. The Seabrook project consists of two 1,150-megawatt nuclear power units utilizing pressurized water reactors. Construction began in July 1976, and as of November 1983 Unit No. 1 was 88% complete. (At that time Unit No. 2 was 28% complete.) The project was originally estimated to cost a total of $1.175 billion, with Unit No. 1 to be in service by November 1979 and Unit No. 2 by September 1981. Delays and cost overruns have escalated the cost to a point where the Board noted, in its May 3, 1985 order in separate Docket No. 4701, that when Unit No. 1 is ready for commercial operation (recent forecast: December 31, 1986), the total investment in the project will have reached $5.3 to $6 billion.

VEG&T has an ownership interest of 0.41259%, a 9745-kilowatt share in each unit. The Board has approved numerous prior applications of participating Vermont utilities for long-term financing in connection with Seabrook. On November 30, 1984 the Board approved VEG&T's application for $2,500,000 in long-term financing to cover its share of construction costs and interest during construction through December 31, 1984. At that time, the Board refused to approve VEG&T's request to issue $11,567,500 in long-term financing to finance its share of the completion of Seabrook, stating that the evidence was insufficient to convince the Board that completion of Seabrook Unit No. 1 was in the best interests of Vermont ratepayers. It referred to a reopened earlier docket (No. 4701), which it planned to use as a forum "to review the economics and rate impact of the project" and in which to decide whether Vermont utilities should be allowed to finance the completion of Seabrook.

On December 28, 1984 the Board scheduled a hearing to be held on April 16, 1985 in Docket No. 4701, and ordered that, if final financing plans, including regulatory approvals, for completing Seabrook were not in effect by April 15, 1985, each Vermont

utility having an interest therein should be prepared to show cause "why the Board should not enter an order requiring such utility immediately to take all feasible and prudent steps to effect the cancellation of the [Seabrook] project and/or terminate its participation therein." A motion for reconsideration filed by the Department was denied by the Board in an order dated January 15, 1985 wherein the Board noted that there was "a significant legal question as to whether the Board, absent a finding that PSNH [Public Service Company of New Hampshire, the principal owner of Seabrook] has not managed this project in accordance with sound practices, can order Vermont utilities to default on their contractual obligations," and that there were possible constitutional issues connected therewith.

The hearing in Docket No. 4701 resumed on April 17, 1985, at which time position statements and offers of proof were taken, but no evidence. It was represented to the Board that owners of more than 75% of the project did not then have financing in place to carry the project to completion and that one of the major owners had been ordered by the Massachusetts Department of Public Utilities on April 4, 1985 not to complete its financing. That order has been appealed to the Supreme Judicial Court of Massachusetts.

On May 3, 1985 the Board, in Docket No. 4701, notified the Vermont utilities to prepare for a show cause hearing at which the Board would consider whether it should enter an order requiring cessation of future payments for Seabrook. That hearing had not been held as of the date of argument herein.

■ In reviewing an appeal from the Board, this Court accords great weight to decisions that are within the Board's expertise, *In re Young's Community TV Corp.*, 141 Vt. 53, 55-56, 442 A.2d 1311, 1312 (1982), and defers to the findings and conclusions of the Board unless they are clearly erroneous. *In re Central Vermont Public Service Corp.*, 141 Vt. 284, 288, 449 A.2d 904, 907 (1982); 30 V.S.A. § 11(b). The appealing party bears the burden of establishing that the Board's order is clearly erroneous. *In re Green Mountain Power Corp.*, 142 Vt. 373, 381, 455 A.2d 823, 826 (1983).

In this case, the Board leaned heavily on the finding that the proposed long-term financing could make available additional short-term financing capability for investment by VEG&T in Seabrook. The Board thus viewed this petition as a step toward ex-

panded future borrowings for the Seabrook project, a step it believed was not consistent with the general good of the state.

In reaching this conclusion, however, the Board ignored another finding that unequivocally stated that "VEG&T will not use this financing to increase its obligations associated with Seabrook Unit No. 1 . . . . Rather it will only use this financing to convert previosly [sic] incurred short-term debt to finance these projects into more permanent long-term financing."

In effect, what the Board has attempted to do, in indirect fashion, is regulate future short-term borrowings by VEG&T in the guise of denying long-term financing for funds that have already been expended. The Board made no determination as to its authority to regulate short-term borrowings for the Seabrook project—a course of action urged by the Department—only stating that its authority to do so is "unclear."[1]

In determining that approval of long-term financing in the instant case was not "consistent with the general good of the State," the Board made no attempt to discuss the effect of its decision on VEG&T or the ultimate ratepayers. One possible consequence is that VEG&T will be forced to default on its obligations to Seabrook, exposing it to additional liabilities under its Seabrook contract. Such consequence was not considered or discussed by the Board in its decision. In fact, the Board, in its May 3, 1985 order in Docket No. 4701, stated as follows:

> We are, therefore, notifying the utilities to *prepare for a show cause hearing at which the issue will be whether we should enter an order requiring a cessation of future payments. Such a step could have far reaching consequences.* Some of the possibilities, such as exposing Vermont utilities to claims for damages, have been alluded to in the course of these proceedings, . . . but *no in-depth analysis has been*

[1] 30 V.S.A. § 108(a) provides in part as follows:

A domestic corporation subject to the jurisdiction of the public service board shall not mortgage nor pledge any of its corporate property nor issue any stocks, bonds, notes or other evidences of indebtedness . . . without the consent of the public service board . . . and a finding of the board that the proposed action will be consistent with the general good of the state. . . . But such corporation may issue evidences of indebtedness payable within one year from the date of issue without such consent provided . . . its total evidences of indebtedness so payable within one year from the date of issue do not exceed twenty per cent of its total assets.

*performed, at least not on the record.* We intend to conduct that analysis with the participation of the parties.

It is clear that, before entering a blanket order prohibiting fur- .ther payments for Seabrook by the participating Vermont utili- ties, the Board intends to conduct an in-depth analysis on the record as to the ramifications of such a decision. Such an analysis has not been conducted herein, and the ramifications to VEG&T and the ultimate ratepayers have not yet been explored.

In its November 30, 1984 order relative to VEG&T's prior re- quest for approval of long-term financing, the Board commented that *"regardless of the Board's decision in Docket 4701, it will be necessary for VEG&T to finance these [short-term] expendi- tures.* If the Board were to disallow their request for long-term financing, VEG&T would be forced to finance these expenditures through short-term loans. This `short-term approach would be more costly than if they issued long-term debt." (Emphasis added.) The Board thereupon authorized VEG&T to issue $2,500,000 in long-term financing "to lessen the impact."

In its December 28, 1984 order in Docket No. 4701, the Board, in discussing short-term indebtedness incurred to that date, said, "There is no dispute that the 'sunk' costs or costs expended to date are irrelevant in the analysis. Those costs *must be borne* whether Seabrook is completed or not and therefore have no bearing on whether to continue with the project from this point forward." (Emphasis added.) Thus, just prior to the issuance of these short-term obligations by VEG&T, the Board recognized the necessity for financing existing short-term borrowings and ruled that they are not relevant in considering the merits of the Seabrook project. The Board's decision that VEG&T should con- tinue to pay higher short-term interest rates for expenditures for which it is already obligated cannot be said to be "consistent with the general good" of VEG&T or the ratepayers who must ulti- mately bear those higher costs. The Board made no attempt to discuss this aspect of its decision in considering "the general good of the State of Vermont."

In separating out the issue of the merits of Seabrook for de- tailed consideration in an independent proceeding, the Board has led VEG&T to believe that the merits of the Seabrook project would be dealt with in Docket No. 4701. In its December 28, 1984 order in that docket, the Board informed all parties, including

VEG&T, that it would make no final decision about Seabrook until at least mid-April 1985. In reliance upon this representation by the Board, VEG&T incurred short-term borrowings through April 15, 1985 which it now seeks to convert into long-term financing. No notice was given by the Board that it would consider the merits of Seabrook in the present proceeding, and in basing its decision herein on that ground, it afforded no opportunity to VEG&T to litigate the issue.

Thus, we hold that, because the finding of the hearing examiner, adopted by the Board, that "VEG&T will not use this financing to increase its obligations associated with Seabrook" does not support the Board's conclusion that this petition is a request "to borrow more money to invest in the Seabrook project," and because VEG&T was afforded no opportunity to litigate the issue on which the Board based its decision, i.e., the merits of Seabrook, the order of the Board must be reversed.

VEG&T asks this Court to enter an order granting its petition. However, one issue not addressed below, which will now need to be dealt with by the Board, is the request by VEG&T that the requirements of 30 V.S.A. § 202(f) not be applied.[2] This statute provides that the Department must determine whether the proposed financing is consistent with the Department's twenty-year electrical energy plan.

---

[2] 30 V.S.A. § 202 provides in part as follows:

(b) The department, through the director, shall prepare an electrical energy plan for the state. The plan shall be for a twenty-year period and shall serve as a basis for state electrical energy policy . . . .

. . . .

(f) After adoption by the department of a final plan, any company seeking board authority to make investments, to finance, to site or construct a generation or transmission facility or to purchase electricity or rights to future electricity, shall notify the department of the proposed action and request a determination by the department whether the proposed action is consistent with the plan. In its determination whether to permit the proposed action, the board shall consider the department's determination of its consistency with the plan along with all other factors required by law or relevant to the board's decision on the proposed action. If the proposed action is inconsistent with the plan, the board may nevertheless authorize the proposed action if it finds that there is good cause to do so. . . .

(g) The director shall annually review that portion of a plan which extends over the next five years. The department, through the director, shall annually extend the plan by one additional year; . . . .

In response to VEG&T's request under the statute, the Department recently determined that the Seabrook project is not in conformance with the twenty-year plan. Such a determination is not strictly in accordance with the requirements of the statute, which requires a finding as to whether the proposed *financing* is consistent with the plan. It is conceivable, in light of prior determinations of the feasibility of Seabrook and prior approvals of Seabrook financing schemes, that the Department could determine that, although Seabrook is not presently in conformance with the plan, the proposed financing for the period January 1, 1985 through April 15, 1985 would be consistent with the plan. In any event, the Board may for "good cause" authorize the proposed financing even if the Department finds it not to be consistent with the twenty-year plan. 30 V.S.A. § 202(f).

VEG&T raises three challenges to the application of the statute. It contends that the twenty-year plan is void because (1) it has not been updated yearly, as required by 30 V.S.A. § 202(g); (2) the Department has not adopted appropriate rules to implement the planning statute; and (3) the Department did not follow proper statutory procedures in adopting the plan.

These issues were not raised prior to the filing of the appeal and will have to be dealt with in the first instance by the Board. *Lanphere v. Beede*, 141 Vt. 126, 129, 446 A.2d 340, 341 (1982); *LaFountain v. Vermont Employment Security Board*, 133 Vt. 42, 48, 330 A.2d 468, 472 (1974).

*Reversed and remanded.*