# In re Petition of Burlington Electric Light Department

[542 A.2d 294]

No. 86-018

Present: **Gibson\*** and **Hayes,\*** JJ., and **Barney, C.J.** (Ret.), **Keyser, J.** (Ret.) and **Martin, Supr. J.,** Specially Assigned

Opinion Filed February 12, 1988

---

\* Justice Gibson and Justice Hayes were present for oral argument but did not participate in this decision.

*Robert E. Fletcher* of *McNeil, Murray & Sorrell, Inc.*, Burlington, for Plaintiff-Appellant.

*Kathleen H. Davis* of *Downs Rachlin & Martin* and *Joseph E. Frank* of *Paul Frank & Collins*, Burlington, for Defendants-Appellees.

**Barney, C.J.** (Ret.), Specially Assigned. The petitioner, Burlington Electric Light Department (Burlington Electric), sought, with two filings, certain rate increases. The proceedings were consolidated before the Public Service Board (Board). That Board, after hearings and findings, determined that Burlington Electric was entitled to rate relief. Its order dated September 17, 1985, directed Burlington Electric to make a compliance filing in accordance with that order.

Shortly thereafter, Burlington Electric made a compliance filing in accordance with the order. The Board rejected it. Ultimately, on October 30, 1985, the Board filed an order of its own, representing its version of the September 17 order. Burlington Electric objected to the October 30 order as unsupported by the findings and inconsistent with the September 17 order, and took this appeal. We reverse.

A full-blown rate proceeding usually involves the examination, and probable alteration, of a complex interrelationship of schedules, costs and income adjustments, seeking, from the Board's point of view, to find a return level sufficient to maintain the economic viability of the utility while fairly allocating the rate burden on consumers. Thus, a rate increase requires a review of the rate base, capital structure, revenue levels and cost and income allocations. In order to achieve an equitable result, such an increase may require alterations in the design of the rate structure, thereby changing allocations of costs and revenues among classes of customers.

The September 17 order dealt with all of these issues, as well as other matters of technical concern relating to the many devices used to substitute for the disciplines of free competition. Of all of those matters, only two are raised as issues in this appeal. One deals with the proper handling of costs related to the McNeil generating plant with respect to its appropriate burden on ratepayers. The other relates to the proper manner in which to assure

that domestic customers get the correct benefit in their rates of low-cost power acquired from the New York Power Authority.

In its order, the Board concerned itself with the McNeil generating plant, which is a part of the generating system of Burlington Electric. Ordinarily, the capital investment representing the generating system used to produce the electricity for a utility's customers is recognized in the rate structure. A return on such investment is essential to attract capital.

The Board specifically found that the McNeil plant represented excess generating capacity, and, as such, distorted the use of a so-called fuel off-set methodology (FOSM). This formula is intended to convert investments in capacity which are made to off-set fuel costs into fuel-energy costs for rate assessment purposes. This formula is accepted as equitable by the Board as long as there is no significant excess capacity present to distort the distribution of energy costs among users. All of this the Board put in its findings.

Those findings stated that "[e]xcess capacity costs are common costs which do not vary with kilowatts, kilowatt hours, or customers and should be allocated as common cost in proportion to total allocable costs." This distinguishes them from energy costs. The Board went on to require that "[a]ll of [Burlington Electric's] capacity costs in McNeil will be treated as excess capacity." This involved the removing of McNeil capacity costs from all of Burlington Electric's schedules and allocating it to all consumer classes in proportion to their class cost of service.

The order described the method to be used:

> The procedure will be to (1) develop a class cost of service *net* of excess McNeil capacity using the FOSM and adjustments to the allocation factors indicated below; (2) from this develop a ratio of each class's cost of service to the total cost of service; (3) apply that ratio to excess McNeil capacity costs; and (4) add the result back to each class cost of service.

The Burlington Electric's compliance filing purported to carry out that mandate. The compliance was literal, in that it removed only McNeil capacity costs from the energy portion of the rate scheduling. This is what the Board rejected.

Although it is nowhere expressly stated, an examination of the Board's October 30 order reveals that it was the Board's view that

the September 17 order "found all of [Burlington Electric's] McNeil entitlement to be excess and ordered [Burlington Electric] to revise its cost allocation having removed all of McNeil."

Burlington Electric justifiably points to a distinction between "capacity costs" and "energy costs." Fuel expenses for operating generating facilities, for example, are different from capacity costs, described by the Board as Burlington Electric's "ownership share of McNeil."

The compelled conclusion is that either the Board inadvertently failed to find that "energy" costs relating to McNeil should be treated as if they were "capacity" costs, or the Board changed its views as to the inclusion of McNeil "energy" costs subsequent to the September 17 order, and without further testimonial proceedings or findings, decided that "energy" cost disposition should follow "capacity" costs for McNeil. In either event there is a shortage in the findings.

■ A basic tenet of administrative law is that a reviewing court "accords great weight" to decisions that are within the administrative agency's expertise "and defers to the findings and conclusions of the [agency] unless they are clearly erroneous." See *In re Vermont Electric Generation & Transmission Cooperative, Inc.*, 146 Vt. 235, 238, 502 A.2d 841, 843 (1985) (citations omitted). However, this tenet only holds true where the administrative proceedings have provided notice and an opportunity to be heard. *In re Green Mountain Power Corp.*, 131 Vt. 284, 293, 305 A.2d 571, 577 (1973). "[T]he parties [must be] given an adequate opportunity to prepare and respond" to the controlling issues. *Id.* Furthermore, the findings of fact made by the agency's board must be "based exclusively on the evidence and on matters officially noticed by the Board." *Id.* at 303-04, 305 A.2d at 583 (citing 3 V.S.A. § 809(g)). See also *In re Central Vermont Public Service Corp.*, 141 Vt. 284, 292, 449 A.2d 904, 909 (1982) ("The exclusion of relevant evidence in an administrative proceeding is presumptively invalid."); 3 V.S.A. § 810(1). Finally, there must be a "full disclosure of the criteria underlying" the order, *In re Consolidated Rate Appeals of Green Mountain Power Corp.*, 142 Vt. 373, 380, 455 A.2d 823, 825 (1983); otherwise, the Court cannot evaluate whether the agency's conclusions are supported by the findings. On this record, we are unable to determine whether there has been error.

According to the record, after an October 17 hearing, it seemed as though additional evidence would be taken, but the October 30 order indicates that this course was consciously rejected, and the challenged order was issued without the taking of further testimony. This left the October 30 order unsupported by essential findings and deprived Burlington Electric of any opportunity to present testimonial challenge to the allocation of McNeil "energy" costs in that order. The allocation of McNeil "energy" costs being unsupported, the order must be reversed on that ground. See *In re Vermont Electric*, 146 Vt. at 241, 502 A.2d at 845.

■ Burlington Electric also faults the Board for the manner in which it handled the allotment of power from the New York State Power Authority (NYPA) with respect to residential class consumers whom it was intended to benefit. The Board ordered the allocation of capacity costs on a coincident peak basis without any adjustment for NYPA power availability. This was based on the Board's determination that it was unfair and improper to favor one class of consumers (residential) by using the already beneficial NYPA power allocation to also reduce the impact of excess McNeil capacity. Since it appears that one of the justifications for the construction of McNeil was the potential loss of NYPA power, the Board's determination that the benefits of McNeil capacity apply to residential consumers as well as other ratepayers is well founded. This is adequate and appropriate justification for requiring them to share the costs. "Absent a clear and convincing showing to the contrary, decisions made within the expertise of [administrative] agencies are presumed correct, valid and reasonable." *In re Johnston*, 145 Vt. 318, 322, 488 A.2d 750, 752 (1985).

*Reversed and remanded as to the allocation of McNeil "energy" costs.*