# Petition of Burlington Electric Department

[563 A.2d 264]

No. 88-323

Present: **Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.**

Opinion Filed May 12, 1989

*McNeil, Murray & Sorrell, Inc.,* Burlington, for Appellant.

*Samuel H. Press, Director for Public Advocacy,* and *George E. Young, Special Counsel,* Montpelier, for Department of Public Service.

*William E. Wargo, Winooski City Attorney,* Winooski, for Appellee.

**Dooley, J.** The Burlington Electric Department (BED) appeals from a decision of the Public Service Board modifying a 1981 order with respect to the number of tons of wood fuel that could be brought to its wood-fired electric generating station by truck. We reverse and remand.

BED petitioned the Board for a certificate of public good pursuant to 30 V.S.A. § 248(a)(2) to construct and operate a 50-

megawatt wood-fired electric generating station, to be known as the Joseph C. McNeil Station. In an order dated September 14, 1981, the Board imposed the following condition on the issuance of the certificate:

> 7. Not less than 75% of all wood fuel to be consumed by the facility shall be delivered to the plant site by railway.

The condition was imposed in response to objections by the City of Winooski to BED's proposal to truck fuel to the plant, usually following a route that went through the City.

On June 5, 1986, BED filed a petition seeking clarification of this condition, urging that since the Board had found that the proposed facility would consume "up to 500,000 tons of wood chips per year," condition 7 should be modified or clarified to state that no more than 125,000 tons of wood fuel could be delivered to the McNeil Station by truck in any annual period (July 1 to June 30). The Vermont Department of Public Service (DPS), the City of Winooski, and the Chittenden County Regional Planning Commission all entered appearances and indicated opposition to the BED petition. The City also alleged that BED was violating condition 7 and requested modification to provide it further protections.

The Board first held a conference that resulted in a scheduling order. After BED submitted prefiled testimony, Winooski moved to dismiss the petition, arguing that the prefiled testimony showed that the condition was clear, that BED was violating it and that BED presented no grounds for modification. On September 9, 1986, the Board held a hearing on the motion. As a result of the hearing, the Board denied the motion, vacated the scheduling order and asked the DPS to commission a study of the issues. On September 25, 1986, DPS wrote the Board declining to commission the study for financial reasons. Periodically thereafter, BED wrote the Board requesting a new scheduling order. Finally, on March 22, 1988, some eighteen months after the last hearing, the Board issued a final order amending condition 7 in the certificate of public good to state as follows:

> 7. All of the wood fuel, or 375,000 tons, whichever is less, which is delivered to McNeil Station in any annual period (July 1 to June 30) shall be delivered by rail.

No evidentiary hearing was held before the order was issued. The Board found, however, that the intent of the original order was that most, if not all, fuel would be delivered by rail, and trucks would be used only "for overflow." BED appeals arguing both procedural and substantive flaws in the Board's action.

BED's principal argument is that the 1988 order goes well beyond interpreting and clarifying the 1981 order and effectively amends it in a manner inconsistent with law. The record supports that contention. Under the original condition 7, the rail-to-truck ratio for delivery of wood fuel to the McNeil Station was set at 75 percent. Since it specified no period within which the ratio was to be applied, the 1981 order was open to differing interpretations. It might have been read to require that 75 percent of all fuel delivered *annually* conform to that minimum, but it might also have ben interpreted to require compliance on a monthly basis, or even continuously. The proper construction of condition 7 did not depend on the total tonnage of fuel deliveries to the plant. Whether the annual usage fell below or exceeded the predicted 500,000 tons, the mandated 75 percent rail delivery (and the allowed 25 percent truck delivery) would apply. Thus, the Board's 1988 order is a modification and not a clarification of the original order.

We also believe that the rationale for the 1988 order is inconsistent with the findings made in 1981, another reason to view the 1988 order as a modification. The City grounded its objections to the use of trucks to transport fuel to the plant on traffic congestion and noise, arguing that the plant would have an adverse impact on public health and safety. The Board did not find factual support for these objections. Instead, the Board concluded "that those who receive the majority of the benefits from a project of this nature should also bear most of the burdens" and, on that basis, required that at least 75% of the fuel be delivered by rail. We find no factual support for the 1988 conclusion of the Board that it had intended that truck traffic be allowed only for overflow. Instead, the 1981 order clearly intended to apportion burdens between BED and the City of Winooski.

■ Condition 7 was part of the certificate of public good issued to BED to allow it to operate the McNeil Station. See *In re Burlington Electric Dep't,* 141 Vt. 540, 543-44, 450 A.2d 1131, 1133 (1982). We have held in other contexts that the amendment of such a certificate may come only after notice and hearing. See *In*

re *Hathorn's Transportation Co.*, 121 Vt. 349, 354, 158 A.2d 464, 467-68 (1960). See generally 4 J. Stein, G. Mitchell & B. Mezines, Administrative Law § 41.06[2] (1989) (as a general principle, agencies are precluded from modifying existing licenses without a hearing). While the statute authorizing the certificate in this case, 30 V.S.A. § 248(a), is silent on the grounds and procedures for amending the certificate, we see no reason for dispensing with these basic procedural requirements in this circumstance.

BED had no meaningful opportunity for a hearing in this case. The circumstances are similar to those in the last BED case before us, *In re Burlington Electric Light Dep't,* 149 Vt. 300, 542 A.2d 294 (1988), where the Board had rejected rate schedules filed by BED and instead created its own rate schedules. There, after one hearing, the Board indicated that it would take further evidence; then it reversed course and issued an order without the additional hearing. *Id.* at 304, 542 A.2d at 296. Because the lack of evidence left its subsequent order unsupported by essential findings and deprived the petitioner of an opportunity to present a testimonial challenge to the Board's position, we reversed. *Id.*

■ Similarly, we conclude in this case that the Board's order cannot stand in the absence of any evidentiary hearing and findings to support it. See *id.* at 303, 542 A.2d at 296 (administrative agency's decision will normally be accorded great weight, but only where administrative proceedings have provided notice and an opportunity to be heard, relying on *In re Green Mountain Power Corp.,* 131 Vt. 284, 293, 305 A.2d 571, 577 (1973)).

■ We also conclude that the Board's summary procedure in this case deprived BED of its right under the Administrative Procedure Act (APA) to "present evidence and argument on all issues involved." See 3 V.S.A. § 809(c). None of the hearings on BED's petition dealt with the merits, and the Board consistently represented that there would be a hearing on the merits. See *In re Crushed Rock, Inc.,* 150 Vt. 613, 624-25, 557 A.2d 84, 91 (1988). The APA required the Board to hold such a hearing before it could modify the certificate of public good. See *id.*

*The order of the Board is reversed, and the matter is remanded for further proceedings consistent with this opinion.*