2013 VT 11

## OCS/Glenn Pappas v. Nan O'Brien

## Nancy Bernheim p/k/a Nan O'Brien v. Glenn Pappas

[67 A.3d 916]

Nos. 10-398 & 11-165

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed March 1, 2013

*Mary Billings Munger*, Office of Child Support, Burlington, for Plaintiff-Appellee (10-398)/Defendant/Appellee (11-165).

*Nancy P. Bernheim* p/k/a *Nan O'Brien*, Pro Se, Essex Junction, Defendant-Appellant (10-398)/Plaintiff-Appellant (11-165).

¶ 1. **Dooley, J.** These consolidated cases present disputes over child support so stale that the parties' children are now in and approaching their thirties. The basic questions are whether father can register and enforce a child support order obtained in Oklahoma against mother and, inversely, whether mother can register and enforce an earlier child support order obtained in Georgia against father. We conclude that mother's various jurisdictional challenges to the Oklahoma order are without merit and are, in any event, precluded by the unappealed adjudication in Oklahoma. We further conclude that the Vermont court has

personal jurisdiction over father with respect to mother's child support claims against him and a statutory immunity provision in the Uniform Interstate Family Support Act (UIFSA) does not apply. As a result, we affirm the superior court's dismissal of mother's enforcement action (Supreme Court Docket Number 2011-165), we affirm the superior court's jurisdictional holdings with regard to the Oklahoma order (Supreme Court Docket Number 2010-398), but we remand the adjudication of father's enforcement action (Supreme Court Docket Number 2010-398) for consideration of counterclaims raised by mother.

¶ 2. Mother and father were married in Oklahoma in 1979. They had two sons, P.P. and A.P. The couple moved to New York in 1983, where they lived until they separated in 1985. The parties were divorced in Los Angeles County, California, in October 1986. Pursuant to the California divorce order, the parties were awarded joint legal custody of the children, then ages three and five. Primary physical custody was awarded to mother, and father was ordered to pay child support in the amount of $237 per month for each child. Eventually, father returned to Oklahoma, and mother moved with the children to Atlanta, Georgia. In October 1994, the Superior Court of Gwinnett County, Georgia, issued an order domesticating the California divorce order and modifying the child support obligation. Finding that father's financial condition had improved and that the needs of the children had increased, the court ordered father to pay $350 per month for each child, as well as a percentage of any bonuses father should receive in addition to his salary. This order stated that child support would cease if "custody is changed by a Court of competent jurisdiction." In 1996, mother moved with the children to New York.

¶ 3. Beginning in July 1998, the younger child, P.P., moved from his mother's home in New York to his father's home in Oklahoma. In November 1998, the older child, A.P., turned eighteen years of age. In April 1999, father filed documents to initiate a child custody proceeding in Oklahoma under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). 43 Okla. Stat. Ann. § 551-101 et seq. Father initially petitioned to have custody of P.P. transferred to him and to have his child support obligation for both children ended — for A.P. because he had attained the age of majority and for P.P. because he was residing with father. Mother moved to bifurcate the issues of custody and child support. A hearing was held in October 1999, at which mother

attempted to make a limited appearance for the purposes of the child custody determination. During the hearing, father requested an order obligating mother to pay him child support for P.P. in addition to changing the child's custody. The Oklahoma court awarded custody to father and retroactively relieved him of any child support obligation as of April 22, 1999, the date he moved for a change of custody. Furthermore, the court ordered mother to pay child support to father in the amount of $338.50 per month, retroactive to April 22, including an arrearage of $2724.00. Mother made two motions for new trials in the Oklahoma court raising jurisdictional concerns. The court denied the first, and mother withdrew the second, after P.P. returned to her custody.[1] She did not appeal either the initial Oklahoma order or the denial of her motion for a new trial.

¶ 4. In early July 2000, P.P. returned to live with mother in Georgia. At that time, father sought enforcement of the child support judgment for the time when P.P. had been in his custody. On July 18, 2000, an Oklahoma Administrative Law Judge issued an administrative order awarding judgment to father in the amount of $2369.50 for child support for the period from January through July of 2000. When this amount was added to the previous judgment, the total arrearage became $5093.50. That amount was reduced in June 2001 by an involuntary payment of $1366.46 made by an administrative offset. Under Oklahoma law, interest on arrears accumulated at a rate of 10% per year. Including the interest and principal, the total amount due through December 31, 2009 comes to $7611.30. The parties do not dispute this calculation.

¶ 5. Mother is now a resident of Vermont; father continues to reside in Oklahoma. In 2008, the Oklahoma Department of Human Services sought to collect the outstanding child support from mother. These enforcement efforts were transferred to Vermont, and, on September 4, 2009, Vermont's Office of Child Support (OCS) filed a petition to register the Oklahoma support order in Vermont, pursuant to UIFSA. Mother responded on October 16, 2009, by filing a motion to set aside the Oklahoma order,

---

[1] Mother contends that her motions were not considered in an adequate or timely fashion. We do not assess these arguments except insofar as they might suggest that mother was denied a full and fair opportunity to litigate the issues of jurisdiction and notice. In this regard, it is significant that, although mother filed these motions for new trials, she did not appeal the initial Oklahoma order.

contesting inter alia the subject matter jurisdiction, personal jurisdiction, and notice in the Oklahoma proceedings. After three days of hearings, a magistrate issued an order registering the Oklahoma support order and granting judgment against mother in the amount of $7611.30. Mother appealed the magistrate's order to the Chittenden Superior Court, Family Division, pursuant to Vermont Rule for Family Proceedings 8(g). On September 15, 2010, the superior court affirmed, concluding that collateral estoppel barred mother from challenging the Oklahoma court's subject matter jurisdiction, that Oklahoma had personal jurisdiction in light of mother's physical presence and participation, and that mother had received adequate notice of the Oklahoma hearings.

¶ 6. Mother also responded to father's enforcement action by pursuing her own enforcement. She filed three documents simultaneously on April 21, 2010, within thirty days from the date of the magistrate's decision: (1) an appeal of the magistrate's decision to the family court; (2) a request for a stay of the magistrate's decision; and (3) an application to register and enforce the Georgia child support order to collect support owed by father to mother under that order. The stay request argued that father owed back child support to mother[2] and it would be inequitable for father to collect back child support owed to him, without paying the child support he owed to mother. The application to enforce the Georgia order was to have the Vermont court determine the amount of back support owed to mother.[3] She claimed that the amount due under the Georgia order, with interest, amounted to $34,093.50. On May 12, before the application was accepted as a separate case, the court denied the stay saying: "If [mother] is entitled to collect past due child support from [father], she may seek appropriate enforcement."

¶ 7. Mother served father with the application, and, in addition, the court notified OCS of the filing. OCS intervened and moved to dismiss. On August 11, 2010, the magistrate granted OCS's motion and dismissed mother's petition, concluding that Vermont courts

---

[2] Mother alleges that she raised the issue of the support owed her to the magistrate, but the magistrate indicated that she had to file a separate request. We can find no record that she raised the issue before the magistrate entered the judgment against her. The first time her claim for support owed her appears is in the request for a stay.

[3] Mother alleges that she filed the application, and the clerk decided, after consulting the magistrate, that the filing had to be treated as a separate action.

lacked personal jurisdiction over father under UIFSA. The magistrate added: "Proper forum more likely state of [father]'s residence. Case could have been initiated in this court but transferred to proper forum to be heard." Mother appealed the magistrate's order to the family division of the superior court, challenging both the determination that personal jurisdiction was absent and the participation of OCS. In an April 18, 2011 order, the family division affirmed the magistrate's decision.

¶ 8. Mother appeals from both adverse decisions — one allowing registration of the Oklahoma order and one denying her attempt to register and enforce the Georgia order. We have consolidated these matters on appeal. In both cases, the primary question is whether Vermont has the authority under UIFSA to register and enforce an out-of-state child support order. This is a question of law, and we consider it de novo. See *Office of Child Support ex rel. Lewis v. Lewis*, 2004 VT 127, ¶ 6, 178 Vt. 204, 882 A.2d 1128. In doing so, we accept the magistrate's findings of fact unless they are clearly erroneous. See *Cavallari v. Martin*, 169 Vt. 210, 220-21, 732 A.2d 739, 746-47 (1999).

¶ 9. Before we address the legal issues, we make one observation to explain, in part, the length and coverage of this opinion. Although the facts may seem commonplace at first, they are not when understood in the context of the applicable law. The combination of three factual elements complicates the analysis of the legal issues: (1) at the time that father sought child support, neither he nor mother nor either of the children resided in the state in which the original child support order was created — California — or in the state in which it was domesticated and modified — Georgia; (2) one of the children moved from the custody of one parent to the custody of the other; and (3) each party alleges that the other party owes back child support. The first factual element has been the subject of a number of decisions from other jurisdictions as we discuss below. The second factual element is rarely present in the reported decisions, and its significance is largely unexplored. The same is true of the third factual element. We can find few reported child support decisions under the governing law where the first element is present with either of the other two, and the few that exist are distinguishable.

¶ 10. The three elements of factual complexity are combined with an element of particular legal complexity. There are two legal regimes governing interstate enforcement and modification of child

support orders and each, read in isolation from the other, would not likely produce the same result on some of the legal issues in this case. The two are UIFSA, 15B V.S.A. §§ 101-904, and the Full Faith and Credit for Child Support Orders Act (FFCCSOA), 28 U.S.C. § 1738B. We explored these legal regimes to some degree in *Cavallari*, 169 Vt. at 216-20, 732 A.2d at 743-46. In doing so, we noted at the outset: "The simple question raised by this case requires the Court to confront the legal jigsaw puzzle of state and federal statutes applicable to the interstate enforcement of child support orders." *Id.* at 211, 732 A.2d at 740. In this case, we have to apply the "legal jigsaw puzzle" to a complex factual scenario as noted above.

¶ 11. In addressing the questions of law in this case, we generally apply Vermont law. With limited exceptions that do not apply here, both UIFSA and FFCCSOA mandate that the law of the forum state governs child support enforcement actions. See 28 U.S.C. § 1738B(h)(1) ("In a proceeding to establish, modify, or enforce a child support order, the forum State's law shall apply . . . ."); 15B V.S.A. § 303 ("Except as otherwise provided by this title, a responding tribunal of this state . . . shall apply the procedural and substantive law, including the rules of choice of law, generally applicable to similar proceedings originating in this state . . . ."); Official Comment, 15B V.S.A. § 303 ("To insure the efficient processing of the huge number of interstate support cases, it is vital that decision-makers apply familiar rules of local law to the maximum degree possible."). Accordingly, insofar as there are differences between Vermont law and that of Oklahoma, our decision is based on Vermont law.

I.

¶ 12. We begin by considering the validity of the Oklahoma child support order, which mother contests on several grounds under UIFSA. In considering mother's arguments, we focus primarily on UIFSA, only occasionally touching upon the application of FFCCSOA,[4] because this is how the parties framed the issues.

---

[4] There is a significant question concerning whether FFCCSOA preempts UIFSA, which we note here, but do not decide. FFCCSOA has many of the same purposes as UIFSA, particularly "to establish national standards under which the courts of the various States shall determine their jurisdiction to issue a child support order and the effect to be given by each State to child support orders issued by the courts of other States," FFCCSOA, Pub. L. No. 103-383, § 2(b), 108 Stat. 4064

Mother's first and major argument is that the Oklahoma court lacked subject matter jurisdiction to issue the order. The essence of this argument is that, under UIFSA, the Oklahoma court could not decide the issue of child support unless father registered the Georgia child support order in Oklahoma and then petitioned in Oklahoma to modify the Georgia order. But the argument runs father into a dead end because under UIFSA the Georgia order could not be modified in Oklahoma on father's request and over mother's objection because Oklahoma was his state of residence. See 43 Okla. Stat. Ann. § 601-611A (describing requirements for modifying child support order from another state including either

(1994), and "to avoid jurisdictional competition and conflict among State courts in the establishment of child support orders." *Id.* § 2(c)(3). FFCCSOA and UIFSA "are for the most part 'complementary or duplicative and not contradictory.' " *Cavallari,* 169 Vt. at 218, 732 A.2d at 745 (quoting *State ex rel. George v. Bray,* 503 S.E.2d 686, 689 (N.C. Ct. App. 1998)). We noted in *Cavallari,* however, that where it applies, FFCCSOA "preempts any inconsistent provision of state law." *Id.*; see *Wilkie v. Silva,* 685 A.2d 1239, 1241 (N.H. 1996).

In this case, the UIFSA prohibition on modifying the Georgia child support order on motion of a resident of Oklahoma, see 43 Okla. Stat. Ann. § 601-611A (describing requirements for modifying child support order from another state including either nonresidence of the petitioner or residence of the child and consent of all parties); see also U.L.A. Unif. Interstate Family Support Act, Refs & Annos, Prefatory Note II.D.2 (1996) ("Except for modification by agreement or when the parties have all moved to the same new state, the party petitioning for modification must submit himself or herself to the forum state where the respondent resides."), is arguably in tension with FFCCSOA, 28 U.S.C. § 1738B. The UIFSA section provides that the forum court "may modify" the foreign order only if the petitioner is a nonresident of the forum state or obtains written consent. 15B V.S.A. § 611(a)(1)(A)-(C), (2). FFCCSOA has a provision that covers the same subject, listing three requirements for when "a State may modify" a child support order from another state, none of which require nonresidency of the petitioner. See 28 U.S.C. § 1738B(e). In short, FFCCSOA does not require the same preconditions for modification as UIFSA — in particular, it does not include the nonresidency requirement that mother argues father failed to meet in the Oklahoma court.

A number of courts have addressed this tension and have split on its consequence. Some courts have refused to find preemption on the grounds that Congress almost certainly did not intend that FFCCSOA preempt UIFSA. See *Hamilton v. Hamilton,* 914 N.E.2d 747, 751 (Ind. 2009); *Basileh v. Alghusain,* 912 N.E.2d 814, 818-20 (Ind. 2009); *Letellier v. Letellier,* 40 S.W.3d 490, 497 (Tenn. 2001). Other courts have found preemption, concluding that the nonresidency requirement is inconsistent with the purposes of FFCCSOA and the FFCCSOA cannot be read to accommodate it. See *Draper v. Burke,* 881 N.E.2d 122 (Mass. 2008); *Bowman v. Bowman,* 917 N.Y.S.2d 379 (App. Div. 2011). This issue was not raised or briefed by either party and we do not decide it here.

nonresidence of petitioner or residence of child and consent of all parties); see also U.L.A. Unif. Interstate Family Support Act, Refs & Annos, Prefatory Note II.D.2 (1996) ("Except for modification by agreement or when the parties have all moved to the same new state, the party petitioning for modification must submit himself or herself to the forum state where the respondent resides."). Because Oklahoma was not authorized under UIFSA to modify the Georgia order, mother contends that its order is void for lack of subject matter jurisdiction.

¶ 13. Father, through OCS, responds that the Georgia order "terminated automatically" when custody was changed due to language in the order stating that "monthly payments shall be made on the first (1st) day of each consecutive month thereafter until . . . custody is changed by a Court of competent jurisdiction." It is the position of father and OCS, therefore, that there was no longer anything to modify — that the Georgia order had expired. Mother responds, however, that even if father's payment obligations terminated, this does not mean that the order itself ceased to exist so as to extinguish child support owed to her and to excuse an Oklahoma proceeding from UIFSA requirements. Insofar as the Georgia order continued to exist, mother argues, the Oklahoma court was required to abide by the UIFSA modification requirements. Because the court did not abide by these requirements, she concludes that the Oklahoma court lacked subject matter jurisdiction.[5]

---

[5] The fact that the UIFSA requirements were not followed does not necessarily mean that the court lacked subject matter jurisdiction. See *In re B.C.*, 169 Vt. 1, 7, 726 A.2d 45, 50 (1999) ("[W]hen a court has jurisdiction over a general category of case, the fact that the court errs in exercising its jurisdiction in a particular case within that general category 'is generally not sufficient to make the resulting judgment void for lack of subject-matter jurisdiction.'" (quoting 12 J. Moore et al., Moore's Federal Practice § 60.44[2][b], at 60-142 (3d ed. 1998))); see also *Burnet v. Desmornes y Alvarez*, 226 U.S. 145, 147 (1912) (explaining that whether "conditions precedent" for suit have been met is not the same thing as whether general jurisdiction exists and that "[w]hen a court has general jurisdiction . . . [i]ts judgment . . . cannot be impeached collaterally by proof that the judgment was wrong."); *State v. Mandicino*, 509 N.W.2d 481, 483 (Iowa 1993) ("[W]here subject matter jurisdiction exists, an impediment to a court's *authority* can be obviated by consent, waiver or estoppel."); *Marley v. Dep't of Labor & Indus.*, 886 P.2d 189, 193 (Wash. 1994) (en banc) ("A court or agency does not lack subject matter jurisdiction solely because it may lack authority to enter a given order."). There is an open question among courts as to whether a failure to abide by the statutory requirement in UIFSA truly constitutes a lack of subject matter jurisdiction or

¶ 14. UIFSA — which has also been adopted in Vermont — contains only a short list of allowable defenses for a party seeking to contest the registration of an out-of-state order. See 15B V.S.A. § 607(a). As the official comment explains, the statute "places the burden on the nonregistering party to assert narrowly defined defenses to registration of a support order." Official Comment, 15B V.S.A. § 607. Although the list specifically includes, among other things, a lack of personal jurisdiction, 15B V.S.A. § 607(a)(1), it does not include a lack of subject matter jurisdiction. But cf. FFCCSOA, 28 U.S.C. § 1738B (requiring that states recognize other states' child support orders so long as there was subject matter jurisdiction, personal jurisdiction, and proper notice). Although this omission is noteworthy, it is not necessarily decisive. Section 603, which describes the effect of registering a child support order, states, "a tribunal of this state and the office of child support shall recognize and enforce . . . a registered order if the issuing tribunal had jurisdiction." 15B V.S.A. § 603(c). This language suggests that, although not listed as a defense, a lack of

---

simply a procedural defect. Compare *McCarthy v. McCarthy*, 785 So. 2d 1138, 1140 (Ala. Civ. App. 2000) (finding that violation of requirement that petitioner be out-of-state resident meant that Alabama court lacked subject matter jurisdiction for UIFSA proceeding and that contempt order was therefore void), *Stone v. Davis*, 55 Cal. Rptr. 3d 833, 836-37 (Ct. App. 2007) ("[UIFSA petitioner] resides in the issuing state, and all of the parties have not filed consents here. Alabama had no jurisdiction to modify the 1997 order. . . . Subject matter jurisdiction cannot be conferred by estoppel."), *State ex rel. Harnes v. Lawrence*, 538 S.E.2d 223, 228 (N.C. Ct. App. 2000) (finding that a North Carolina court's attempted modification and subsequent contempt order were void because New Jersey had continuing, exclusive jurisdiction under FFCCSOA and UIFSA), and *State ex rel. Freeman v. Sadlier*, 1998 SD 114, ¶¶ 9-10, 586 N.W.2d 171 (concluding that modification order that was not timely appealed was nevertheless void for lack of subject matter jurisdiction because modification was pursued in petitioner's home state in violation of UIFSA requirements), with *State ex rel. Children, Youth & Families Dep't v. Andree G.*, 2007-NMCA-156, ¶ 23, 174 P.3d 531 ("Although [the appellant] claims that the Texas court's order is void because the Texas court acted contrary to its authority under the UIFSA and the FFCCSOA, [the appellant] does not, and cannot, claim that the Texas court lacked jurisdiction in the fundamental sense to hear and determine a child support action pursuant to Texas law. . . . Thus, [the appellant's] claim of jurisdictional error is subject to ordinary principles of waiver, estoppel, disfavor of collateral attack, and res judicata."), and *In re Schneider*, 268 P.3d 215, 219 (Wash. 2011) ("The legislature has limited the superior courts' *authority* — not the superior courts' *jurisdiction* — to modify another state's child support order by adopting the UIFSA."). We do not reach this question here.

subject matter jurisdiction in the issuing tribunal is a barrier to registering and enforcing an order.

¶ 15. Nevertheless, we reject mother's attempt to contest the validity of the Oklahoma order on the basis that the Oklahoma court lacked subject matter jurisdiction. Her argument fails for two reasons. First, we conclude that mother is precluded from challenging subject matter jurisdiction because she thoroughly litigated that issue in the Oklahoma proceeding. Second, mother's argument fails on the merits insofar as we conclude that the Oklahoma court's child support order was not a modification for the purposes of UIFSA.

A.

■ ¶ 16. The superior court concluded that mother is collaterally estopped from raising subject matter jurisdiction.[6] We affirm the court's conclusion. Because the issue of subject matter juris-

---

[6] The superior court rested its conclusion on the fact that the traditional elements of issue preclusion were satisfied in this case. The five elements of issue preclusion are set out in *Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990):

> (1) preclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

As discussed in the main text, *infra*, ¶¶ 17-21, these conditions, especially condition (4), may not be sufficient conditions in the context of subject matter jurisdiction, but they are still necessary conditions. And we accept the superior court's conclusion that they were satisfied in this case. Mother was a party in the Oklahoma action, she raised the issue of subject matter jurisdiction at the Oklahoma proceedings, and the Oklahoma court determined that it had subject matter jurisdiction. This was a final judgment on the same issue raised in this case. After the court denied her motion to dismiss for lack of jurisdiction, mother moved for a new trial raising again her jurisdictional concerns, and the court denied this motion. She could have appealed either of these rulings. Although mother did unsuccessfully seek a new trial, raising a number of these alleged errors, this is not equivalent to bringing an appeal. We see no error in the superior court's conclusion that mother had a full and fair opportunity to litigate the jurisdictional issues in Oklahoma. Finally, applying collateral estoppel is arguably fair in this case. Father had custody of P.P. for a period of time during which it was appropriate for mother to pay child support. Cf. *McCormick v. McCormick*, 150 Vt. 431, 437, 553 A.2d 1098, 1102-03 (1988) ("Ordinarily . . . child support should be paid through the custodial parent . . . ."). Mother's objections are

diction was decided by the Oklahoma court after having been litigated there, we must give that determination full faith and credit.

¶ 17. The conclusion that mother is precluded from collaterally challenging the Oklahoma court's subject matter jurisdiction may appear to fly in the face of the traditional notion that subject matter jurisdiction can be raised at any time as a collateral challenge to a judgment. See, e.g., *In re Taft Corners Assocs.*, 162 Vt. 638, 639, 650 A.2d 520, 521 (1994) (mem.) ("Subject matter jurisdiction may not be waived . . . ."). Mother relies on this legal principle. This understanding would seem to overcome any obstacle raised because subject matter jurisdiction was litigated previously. Cf. *Boisvert v. Boisvert*, 143 Vt. 445, 447, 466 A.2d 1184, 1185 (1983) ("It is well settled that a court's lack of subject matter jurisdiction may be raised at any time.").

¶ 18. The conception of subject matter jurisdiction as perpetually open to collateral attack is not entirely correct and is contrary to the modern understanding, particularly in this jurisdiction, and is incorrect in the context before us. When a court of another state has fully and fairly litigated an issue — including an issue of jurisdiction — and has reached a final judgment, we are required to give full effect to that state's determination. See *Durfee v. Duke*, 375 U.S. 106, 111-13 (1963). Although we may inquire into whether a court of another state had jurisdiction before giving that state's judgment full faith and credit, we are required to give credit to that court's determination that it had jurisdiction where the issue was fully contested. See *Driver v. Driver*, 148 Vt. 560, 562, 536 A.2d 557, 558 (1987) ("[T]he jurisdiction of [another state's] court may be subject to collateral attack in Vermont if jurisdiction had not been contested and determined by the [other] court."). This principle, derived from the Full Faith and Credit Clause of the United States Constitution, U.S. Const. art. IV, § 1, has been established in a number of United States Supreme Court decisions. See, e.g., *Treinies v. Sunshine Mining Co.*, 308 U.S. 66, 78 (1939) ("One trial of an issue is enough. The principles of *res judicata* apply to questions of jurisdiction as well as to other issues, as well to jurisdiction of the subject matter as of the parties." (citation and quotation omitted)).

primarily to the form rather than the content of the order, and that is something more appropriately addressed directly on appeal.

■ ¶ 19. Notable among these decisions was a reversal of this Court in *Cook v. Cook*, 342 U.S. 126 (1951), *rev'g* 116 Vt. 374, 76 A.2d 593 (1950). We had held that a party could collaterally attack the subject matter jurisdiction of a Florida divorce decree on the grounds that the divorcing party was not properly domiciled in Florida as required by Florida law. See *Cook*, 116 Vt. at 377-79, 76 A.2d at 595-96. The United States Supreme Court held that "[a] judgment presumes jurisdiction over the subject matter and over the persons," and that "[t]he Florida decree is entitled to that presumption." 342 U.S. at 128. The Court went on to explain that the jurisdiction of the Florida court would be open to collateral attack only if it was demonstrated that the jurisdictional issues were not adequately contested in Florida. The Court explained:

> That presumption [of jurisdiction] may of course be overcome by showing, for example, that [the husband] never . . . made an appearance in the case either generally or specially to contest the jurisdictional issues. . . . [I]t is essential that the court know what transpired in Florida before this collateral attack on the Florida decree can be resolved. For until Florida's jurisdiction is shown to be vulnerable, Vermont may not relitigate the issue of domicile on which the Florida decree rests.

*Id.* at 128-29. On remand, we summarized, "It now appears to be the law that when the petitionee in a divorce case appears and has the opportunity to contest the jurisdiction . . . the Full Faith and Credit Clause precludes their attacking it in the courts of a sister state." *Cook v. Cook*, 117 Vt. 173, 174-75, 86 A.2d 923, 924 (1952).

■ ■ ¶ 20. Twelve years later, in *Durfee*, the Supreme Court reinforced the principle that even jurisdictional determinations are res judicata so long as they were adequately contested in the original state. The Court explained:

> [W]hile it is established that a court in one State, when asked to give effect to the judgment of a court in another State, may constitutionally inquire into the foreign court's jurisdiction to render that judgment, the modern decisions of this Court have carefully delineated the permis-

sible scope of such an inquiry. From these decisions there emerges the general rule that a judgment is entitled to full faith and credit — even as to questions of jurisdiction — when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which' rendered the original judgment.

375 U.S. at 111. Thus, it has become the settled rule that jurisdictional determinations of another state do have preclusive effect so long as they were "fully and fairly litigated." See Restatement (Second) of Judgments § 12 cmt. c (1982) ("When the question of the tribunal's jurisdiction is raised in the original action, in a modern procedural regime there is no reason why the determination of the issue should not thereafter be conclusive under the usual rules of issue preclusion."); see, e.g., *Tomai-Minogue v. State Farm Mut. Auto. Ins. Co.*, 770 F.2d 1228, 1233 n.7 (4th Cir. 1985) ("[W]here the defendant makes a special appearance, and the jurisdictional issue has been fully and fairly litigated and finally decided in the original forum, the resulting judgment is entitled to full faith and credit even as to the existence of personal and subject matter jurisdiction.").

■■ ¶ 21. The teachings of the United States Supreme Court precedents are well summarized in the Restatement (Second) of Judgments § 12. The Restatement provides the general rule that a judgment after an issue was litigated precludes parties challenging the issuing court's subject matter jurisdiction in a subsequent action unless one of three exceptions is present:

(1) The subject matter of the action was so plainly beyond the court's jurisdiction that its entertaining the action was a manifest abuse of authority; or (2) Allowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government; or (3) The judgment was rendered by a court lacking capability to make an adequately informed determination of a question concerning its own jurisdiction and as a matter of procedural fairness the party seeking to avoid the judgment should have opportunity belatedly to attack the court's subject matter jurisdiction.

Restatement (Second) of Judgments § 12. Clearly neither the second nor the third alternative is present in this case. Enforcing

the Oklahoma judgment does not infringe on the authority of another tribunal or agency, and the Oklahoma court was fully capable of determining its own jurisdiction. Whether the decision was right or wrong, we cannot conclude that the subject matter of the Oklahoma action was so plainly beyond the court's jurisdiction that the court manifestly abused its authority. See *Wall v. Stinson*, 983 P.2d 736, 742-43 (Alaska 1999); see also *B.C.*, 169 Vt. at 8, 726 A.2d at 50 ("Unless a court has usurped power not accorded to it, its exercise of subject matter jurisdiction is binding in subsequent proceedings as long as the jurisdictional question was litigated and decided or the parties had an opportunity to contest subject-matter jurisdiction but failed to do so."). In this case, therefore, the Oklahoma court's judgment is not subject to collateral attack in Vermont regarding issues that were fully and fairly litigated in Oklahoma.[7]

¶ 22. In this case, the issue of subject matter jurisdiction was sufficiently litigated that we must afford Oklahoma's determination full faith and credit. Mother was a party in the Oklahoma action, and she raised the issue of subject matter jurisdiction in that proceeding. In particular, mother filed a written response to father's petition in which she challenged the court's authority to address child support issues in the context of a UCCJEA case. Before the hearing, in the context of a motion to continue the hearing or bifurcate the custody and child support issues, she reiterated her argument that "the UCCJEA is an improper jurisdictional vehicle for child support determinations of a foreign support Order, and that the Oklahoma District Court was not vested with the jurisdictional authority to make monetary rulings under the auspices of the UCCJEA." In the Oklahoma hearing, mother, representing herself, and father's lawyer both argued to the judge about the applicability and impact of UIFSA

---

[7] We note a contrast with our decision in *Lewis*, 2004 VT 127, ¶ 15 ("Although UIFSA is a uniform law that purports to facilitate long-distance enforcement of child support, each state has enacted its own procedures for the establishment of child support orders. If the order is established according to law in one state, the order can be enforced through this interstate mechanism. If, on the other hand, the order is not established according to law, UIFSA enforcement procedures cannot overcome the defect and expand a court's jurisdiction."). In that case, there was no order from Iowa to be enforced in Vermont. In this case, an out-of-state order indisputably exists, and the question is merely whether the appropriate procedures were followed in obtaining it.

with respect to the jurisdictional issues. After this briefing and argument, the Oklahoma court determined that it had subject matter jurisdiction.[8] After the court's ruling, mother moved for a new trial and extensively briefed her jurisdictional arguments. The court denied the motion. She could have appealed the court's underlying ruling or the court's denial of her motion for a new trial, but she did not. We acknowledge that mother's effort to challenge the Oklahoma order might have continued had her son not returned to her custody, but on this record we conclude that the issue of subject matter jurisdiction was fully and fairly litigated.

### B.

¶ 23. Even if we were to conclude that mother could renew her jurisdictional challenge in this Court, we are not convinced that the UIFSA jurisdictional requirements were violated in this case. The UIFSA requirement that the petitioner not reside in the forum state applies only to modifications of prior custody orders. See 15B V.S.A. § 611(a)(1)(B). Thus, mother's contention that the Oklahoma court lacked subject matter jurisdiction to issue its support order is premised on the notion that father was seeking a modification of the prior Georgia support order. We conclude that the Oklahoma order was not a modification of the preexisting Georgia order for the purposes of UIFSA.

¶ 24. As noted, the Georgia order explicitly stated that child support would cease if "custody is changed by a Court of competent jurisdiction." Here, there is no dispute that custody was changed by a court of competent jurisdiction. As a result, father's ongoing support obligation expired. This does not mean that the Georgia support order no longer exists or cannot form the basis for an arrearage or other claim. But though the Georgia

---

[8] The Oklahoma court's decision in this regard is somewhat puzzling. The court's order stated that the court "ha[d] personal jurisdiction over each of the parties pursuant to [UIFSA] and subject matter jurisdiction pursuant to the [UCCJEA], in [that] this state is the 'home state' of the minor child." As mother rightly pointed out at the time and reiterated now, what is not stated is that the court had subject matter jurisdiction pursuant to UIFSA, which is precisely what mother denies. This language aside, given the briefing and argument noted above, we conclude that the Oklahoma court clearly intended to address all arguments, including those involving UIFSA, and render a decision on them. Thus, it necessarily determined that it had subject matter jurisdiction in reaching the order that it did and denying mother's motion to dismiss for lack of jurisdiction.

order still governs the parties' support obligations from before the change of custody, it has expired in the sense that it has no prospective effect with respect to support obligations. Once the Oklahoma court, a court of competent jurisdiction, entered an order transferring custody of the only remaining minor child from mother to father, father's support obligation expired under the terms of the Georgia support order. Having modified custody, and with the Georgia support obligation no longer in effect by its own terms, the Oklahoma court had jurisdiction to address father's new and independent request for child support.

¶ 25. In short, by its own terms, the Georgia order expired when father obtained custody of P.P., thereby ending both parents' prospective child support obligations under the order. Absent the automatic termination provision of the Georgia order, father's obligation to pay mother child support would have continued — even after he was awarded custody of the child — until the Georgia order was modified by court decision. Thus, without a provision automatically terminating child support upon change of custody, an award of child support to the new custodian would have been a modified order necessarily terminating the former custodian's right to child support under the preexisting order and would therefore have been subject to the jurisdictional requirements for modification under UIFSA. This case is different, however, because, for the reasons stated above, the Georgia support order expired when the Oklahoma court transferred custody to father.[9]

---

[9] Mother notes that the Georgia order had not expired as to coverage of health expenses because those expenses were covered by a different paragraph of the order with a different expiration trigger. Under Part 4 of the Georgia order, mother was required to provide health insurance for the children until a child "attains his majority, becomes emancipated, dies, marries or until further Order from a Court of competent jurisdiction." It goes on to provide that for "reasonable and necessary medical, dental and orthodontic costs not covered by insurance [father] shall be responsible to reimburse [mother] for two-thirds (2/3) of said uncovered expenses." The reimbursement is to occur after mother sends father "proper supporting documents indicating the amount to be reimbursed." The language contains no explicit expiration trigger by changed custody.

Although not mentioned by mother, the Oklahoma order contains a new medical expense payment requirement making father responsible for obtaining health insurance for the child, and further making both father and mother responsible on a 50/50 basis for uncovered health-related expenses. There is no indication that father failed to comply with the Oklahoma order, that mother continued to

¶ 26. This case is not controlled by the line of cases culminating in *Spencer v. Spencer*, 882 N.E.2d 886 (N.Y. 2008), a decision that is factually very different, but provides some context and a basis for comparison. *Spencer* was the final resolution of a series of New York cases where the prospective obligation to pay child support had reached an end point because the child covered by the order had reached the age of majority in the state where the order was issued. Some New York courts had held that in the case of an order from another state that had expired due to the age of the minor, they could extend the duration of the previous obligation at the request of the obligee because the age of majority was higher in New York than in the state where the order was issued. They held that such an extension was not a modification of the initial order because that order had expired by its terms. See, e.g., *Ferraro v. Nash*, 739 N.Y.S.2d 838, 839 (App. Div. 2002).

¶ 27. The "only issue" in *Spencer*, however, was whether the New York child support petitions that were filed after the termination of the initial out-of-state child support obligation "because the child reached the issuing state's age of majority [sought] a 'modification' of the issuing state's order." 882 N.E.2d at 889-90. The *Spencer* court answered in the affirmative for three reasons. First, the New York orders fit within FFCCSOA's broad definition of "modification" because they changed the amount, scope, and most particularly the duration of the out-of-state order. *Id.* at 890; see 28 U.S.C. § 1738B(b) (defining "modification" as "a

purchase health insurance for P.P., or that the parties shared any uncovered health expenditures. The amount of back-due support father seeks contains no amount for health expenses, nor does the amount mother seeks contain any claim for health expenses. In general, the Oklahoma order is more favorable to mother than the Georgia order, and we may presume that mother benefitted from that advantage. Thus, there is no necessity for us to construe the Georgia provision.

If we were to reach the issue of the health expenses, we note that the term "Court of competent jurisdiction" is ambiguous in the Georgia order. The ambiguity particularly comes from the language on uncovered expenses, which assumes that mother as custodian is arranging for the uncovered medical care and is initially paying for it, subject to her right to bill father for a share of those expenses. The language does not make sense if father is custodian. Sense can be restored if "Court of competent jurisdiction" in Part 4 governing health expenses means the same as it does in Part 5 on child support — that is, a court with jurisdiction to change custody. That meaning makes Part 4 internally consistent. Under that meaning, the Oklahoma order on health expenses is specifically provided for in the Georgia order and is not a modification of the Georgia order.

change in a child support order that affects the amount, scope, or duration of the order and modifies, replaces, supersedes, or otherwise is made subsequent to the child support order"). Second, drafters of UIFSA made explicit in comments and amendments to the model act that subsequent orders extending the duration of initial support orders that had expired because of the original issuing state's lower age limit on such orders should be considered a modification of the original order for purposes of UIFSA. *Spencer*, 882 N.E.2d at 890-91; see U.L.A. Unif. Interstate Family Support Act § 611(c) cmt. (1996); *id.* § 611(d) (2001). Third, allowing New York courts to enter support orders extending the duration of support beyond the age limit in the original issuing courts' orders undermined the principle of comity critical to the policies underlying FFCCSOA and UIFSA. *Spencer*, 882 N.E.2d at 891.

¶ 28. This case is plainly distinguishable. In the cases governed by *Spencer*, the New York orders were inconsistent with, and therefore a modification of, the original issuing courts' support orders. In contrast, the Oklahoma order in this case was entirely consistent with the expired Georgia order, which, by its own terms, ended father's ongoing child support obligations upon a change of custody, which occurred before the Oklahoma court issued its support order. This is not a situation in which one court extended the duration of the original child support obligation. In this case, the support obligation no longer had any prospective effect based on the original order's own terms following a change of custody. Thus, as explained above, the Oklahoma court's order was a new and independent order rather than a modification of the expired Georgia order. Cf. *Andree G.*, 2007-NMCA-156, ¶¶ 37-38 (concluding that Texas support order did not "modify" prior New Mexico support order because New Mexico order concerned arrearages father owed to state agency while Texas order concerned prospective support owed to mother).

¶ 29. We do not consider this result to be at odds with UIFSA's one-order philosophy. The primary aim of UIFSA is to ensure that states do not second-guess the support orders of other states, thereby opening the door to forum shopping and the proliferation of conflicting orders. See generally K. Kemper, Annotation, *Construction and Application of Uniform Interstate Family Support Act*, 90 A.L.R.5th 1, §§ 2, 2.5 (2001). That is not what occurred in this case.

¶ 30. Allowing father to proceed in Oklahoma also makes practical sense. Having obtained custody of P.P., father was in no different position than a custodial parent who was seeking a support order for the first time against the other parent residing in another state. In general, if there is no child support order in place, then the custodial parent can initiate a proceeding in his or her state of residence — assuming the custodian has personal jurisdiction over the noncustodial parent under UIFSA's liberal personal jurisdiction rules — and then seek an enforcement order in the state of the noncustodial parent. See 15B V.S.A. § 201. In the present case, when father obtained custody of P.P., there was no order in effect providing child support for the ongoing costs of P.P.'s living expenses. If we define the Oklahoma court's action as a modification of the Georgia order in this case, father is denied the normal UIFSA avenue to obtain child support through the courts of his home state. Father would have fewer options for obtaining child support essentially because he was previously a noncustodial parent.

¶ 31. This additional hurdle may have practical significance for parents like father. Given the age of the child and the temporary nature of father's custody, the cost of pursuing establishment and enforcement of a support order in Vermont, or Georgia if jurisdiction there is still available, is likely prohibitive in relation to the amount of support to be obtained. Thus, the consequence of accepting mother's argument is very likely no support order at all for a period in which the child is undeniably entitled to support from the noncustodial parent. While we have become consumed by jurisdictional challenges, mother has no apparent defense to a claim that she should pay some amount of child support during the period father was the custodial parent.[10] We cannot view there being no support order for that period as consistent with the intent of UIFSA.

## II.

¶ 32. Mother's second argument is that the Oklahoma court lacked personal jurisdiction over her for the purposes of deter-

---

[10] Indeed, to the extent we can determine why this conflict has escalated over a relatively small amount of money, it is because mother believes she is owed child support in an amount at least as great as the amount claimed by father. As we hold *infra*, the reasonable response is to allow mother to litigate all her claims against father at the same time his are litigated against her in the hope that the whole dispute can finally be resolved.

mining child support.[11] Unlike subject matter jurisdiction, a lack of personal jurisdiction is one of the listed defenses under UIFSA. 15B V.S.A. § 607(a)(1). In this case, mother contends that her participation was strictly for the purposes of the UCCJEA proceeding to determine custody and that she consistently denied the personal jurisdiction of the Oklahoma court to determine child support. Father, through OCS, argues that mother's participation in the Oklahoma proceedings, availing herself of the benefits and laws of Oklahoma, established personal jurisdiction over mother. Father also contends that the issue of personal jurisdiction was litigated already and is res judicata. The superior court agreed, explaining:

> [Mother] was physically present in Oklahoma for the purpose of attending and participating in hearings. She filed pleadings, testified in court, and otherwise availed herself of the benefits and laws of Oklahoma. In December of 2000, [mother] filed a motion in the Oklahoma court to transfer custody of the parties' younger son back to her, thereby purposefully taking advantage of services in that state. The Oklahoma court made a

---

[11] Although the Oklahoma court clearly determined that it had personal jurisdiction to order child support, the record is not altogether transparent on the court's reasoning. The minute book from the Oklahoma court includes the following entry: "Court finds it has jurisdiction to modify child custody and child support follows under the law." The transcript of the hearing provides little further clue, with the court stating: "Well, let me just say that we have resolved the issue of jurisdiction for this Court to consider the motion to modify custody. And I believe that with that determination, the Court clearly has the authority to assess child support as part of a prospective child support — or a child custody order." And further: "I believe that this Court has jurisdiction to modify custody and to levy an award of child support. I have the right to do that under Oklahoma law." These formulations seem to imply that jurisdiction to order child support follows from jurisdiction to alter custody without an additional finding of personal jurisdiction — a proposition that is incorrect. See, e.g., *In re Paternity of Carlin L.S.*, 593 N.W.2d 486, 490 (Wis. Ct. App. 1999) ("[W]hile support is often an incident of custody, a court with jurisdiction . . . to determine custody, may nevertheless lack personal jurisdiction over a nonresident parent for the purposes of setting support."). Regardless, the court's findings specifically included a determination that the court had personal jurisdiction pursuant to UIFSA, even though the reasoning behind this finding is difficult to understand. As the important question for our purposes is whether mother can show a lack of personal jurisdiction — not whether the court's rationale for finding personal jurisdiction was correct — determining the court's actual reasoning is unnecessary.

finding that it had personal jurisdiction over [mother], and [mother] did not appeal this order.

Taking these findings to be true, the central question is whether any of these facts prevent mother from raising personal jurisdiction as a defense. We conclude that the last of the listed findings achieves this purpose.

¶ 33. Contrary to father's primary argument, physical presence and active participation at a UCCJEA proceeding does not establish personal jurisdiction for the purposes of ordering child support. The UCCJEA — and thus Oklahoma law — contains a specific immunity provision, which states:

> A party to a child custody proceeding, including a modification proceeding, or a petitioner or respondent in a proceeding to enforce or register a child custody determination is not subject to personal jurisdiction in this state for another proceeding or purpose solely by reason of having participated, or having been physically present for the purpose of participating, in the proceeding.

43 Okla. Stat. Ann. § 551-109A. This immunity provision means that a party may make a limited appearance for the purposes of determining custody without acquiescing to personal jurisdiction with regard to child support. See *Hollowell v. Tamburro*, 991 So. 2d 1022, 1025 (Fla. Dist. Ct. App. 2008) ("The father concedes that the circuit court has subject matter jurisdiction to address the issues of custody and visitation, that the court may make a 'child custody determination' under the UCCJEA. Under [the UCCJEA], the father has the right to participate in the proceedings concerning those issues without waiving his objection to personal jurisdiction over financial issues."); cf. *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 97-98 (1978) ("[A]ppellant did no more than acquiesce in the stated preference of one of his children to live with her mother in California. This single act is surely not one that a reasonable parent would expect to result in the substantial financial burden and personal strain of litigating a child-support suit in a forum 3,000 miles away, and we therefore see no basis on which it can be said that appellant could reasonably have anticipated being 'haled before a [California] court.'" (quoting *Shaffer v. Heitner*, 433 U.S. 186, 216 (1977)).

Mother raised this immunity before the Oklahoma court. Mother was therefore not subject to personal jurisdiction for the purposes of child support by virtue of her participation in the child custody hearing.

¶ 34. Father, through OCS, argues in the alternative that mother waived her limited appearance by requesting substantive relief and not cabining herself to contesting jurisdiction. After examining mother's filings, we find nothing to support the suggestion that she ever deviated from arguing that the Oklahoma court lacked jurisdiction.[12]

¶ 35. Finally, father argues that the Oklahoma court had personal jurisdiction on the grounds that mother and father had sexual intercourse in Oklahoma and P.P. may have been conceived as a result of that intercourse. Under UIFSA, this is a valid basis for personal jurisdiction. 43 Okla. Stat. Ann. § 601-2016. Mother responds, however, that UIFSA was not in effect at the time of her pregnancy and cannot be applied retroactively. Whether or not this argument is correct as a matter of statutory effect,[13] mother's response mistakenly treats personal jurisdiction as though it were a statutory requirement. Assuming that conception within the state satisfies the "minimum contacts" requirement of the Constitution, see *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), then Oklahoma could have asserted jurisdiction over mother on the basis of her pregnancy regardless of the enactment of UIFSA. This suggests a potentially valid basis for personal jurisdiction, but ultimately we need not decide this question.

¶ 36. We reject mother's attempt to contest the Oklahoma order for lack of personal jurisdiction for a more basic reason: she thoroughly litigated the issue of personal jurisdiction in Oklahoma and cannot, whatever the merits, relitigate it here. As noted

---

[12] Both father and the superior court suggest that personal jurisdiction was established, in part, when mother filed a custody motion in December 2000. This motion was filed after the original custody hearing took place — October 1999 — and the order had issued — April 2000. It therefore could not have established personal jurisdiction for that order, and the superior court's reference to that filing in this case does not persuade us that it established personal jurisdiction for the order in issue.

[13] The Massachusetts Supreme Judicial Court addressed this question in *Child Support Enforcement Div. of Alaska v. Brenckle*, 675 N.E.2d 390, 393 (Mass. 1997): "As a remedial statute, and one not affecting substantive rights, it is proper that UIFSA should be applied retroactively."

above, see *supra* I.A., ¶¶ 16-22, even on jurisdictional questions, another state's judgments may have preclusive effect under the Full Faith and Credit Clause. See *Durfee*, 375 U.S. at 111 ("[A] judgment is entitled to full faith and credit — even as to questions of jurisdiction — when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment.").

¶ 37. In this case, mother extensively argued a lack of personal jurisdiction in multiple and lengthy court filings, the Oklahoma court concluded that it had personal jurisdiction, and mother did not appeal. There is nothing so unique about personal jurisdiction as to allow mother to relitigate the issue here in Vermont. See *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706-07 (1982) ("This argument again assumes that there is something unique about the requirement of personal jurisdiction, which prevents it from being established or waived like other rights. A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding. By submitting to the jurisdiction of the court for the limited purpose of challenging jurisdiction, the defendant agrees to abide by that court's determination on the issue of jurisdiction: That decision will be res judicata on that issue in any further proceedings." (citations omitted)); *Sherrer v. Sherrer*, 334 U.S. 343, 348 (1948) ("It is clear that respondent was afforded his day in court with respect to every issue involved in the litigation, including the jurisdictional issue of petitioner's domicile. Under such circumstances, there is nothing in the concept of due process which demands that a defendant be afforded a second opportunity to litigate the existence of jurisdictional facts.").

## III.

¶ 38. Mother's final collateral challenge to the Oklahoma child support order is that she did not receive proper notice. She makes two separate arguments in this regard. First, she contends that, because father's initial petition in the Oklahoma court did not include a prayer for child support, she was not on notice that child support would be addressed in the Oklahoma child custody hearing. Second, she argues that she was not given notice of a July 2000 administrative hearing at which an Oklahoma administrative court issued a default judgment against her.

¶ 39. In her first argument, she claims that the failure of father or the court to notify her that child support was in issue denied her due process of law under the Fourteenth Amendment. Where a lack of notice violates the due process rights of a party, a judgment may be unenforceable for that reason. See *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Pizzano Constr. Co. v. Hadwen*, 133 Vt. 495, 499, 346 A.2d 224, 226 (1975) ("We hold that the court's action imposing liability upon the defendants under the circumstances disclosed by the record deprived them of their due process right to meaningful notice and opportunity to be heard, making the initial judgment void."). It is true that father's petition never stated that father would be seeking child support, although it did request that father's child support obligations be eliminated. See *In re Green Mountain Power Corp.*, 131 Vt. 284, 293, 305 A.2d 571, 577 (1973) ("The question on review is not the adequacy of the original notice or pleading but is the fairness of the whole procedure. Critical to a determination of whether the procedure was fair is whether or not the parties were given an adequate opportunity to prepare and respond *to the issues raised in the proceeding*." (emphasis added)). Essentially mother's argument is that the notice provided to her prior to the Oklahoma proceeding was so inadequate as to deny her a meaningful opportunity to be heard.

¶ 40. The short answer to this argument, as with the arguments that the Oklahoma court lacked subject matter and personal jurisdiction, is that the Oklahoma judgment cannot be collaterally attacked on this basis where mother litigated the issue in Oklahoma, the Oklahoma court rejected her position, and she failed to appeal. See, e.g., *Nacorra v. INS*, 52 F. App'x 896, 897 (9th Cir. 2002) (mem.) (holding that "general principles of res judicata prevent relitigating" lack of notice where it was decided previously); *Brownlee v. W. Chain Co.*, 364 N.E.2d 926, 929 (Ill. App. Ct. 1977) ("Defendant was afforded the opportunity to litigate the notice and due process issue in [another state]. We therefore believe the doctrine of *res judicata* bars defendant from attacking collaterally the [out-of-state] judgment in Illinois.").

 ¶ 41. Even if mother's argument were not precluded, we would reject it on the merits. Father raises two persuasive responses: (1) the Oklahoma court was required to enter a child support order against mother, when it changed custody of P.P., and no specific notice was required under those circumstances; and (2) mother had adequate notice to allow her to meaningfully participate in the proceedings that resulted in the Oklahoma child support order. According to father, mother had sufficient notice both as a matter of law and as a matter of fact.

 ¶ 42. The first response claims that the omission is not consequential because mother is charged with the knowledge of the law. This argument relies upon *State ex rel. Huffman v. Robertson*, 853 P.2d 249, 251-52 (Okla. Civ. App. 1993), which held in a factually similar case that the legal requirement that the trial court issue a child support order when modifying custody gave adequate notice to answer a due process challenge:

> [T]he crux of the matter is that upon receiving notice of the father's motion to modify custody, the mother was charged with notice that if the motion was granted the court had a statutory duty to make appropriate provisions for the child's support as a necessary incident to the new custodial arrangement. And she also knew, or should have known from her earlier experience in court, that both parents are responsible for the support of their child and that as a non-custodial parent she could expect to have to contribute to its support.
>
> . . . [O]nce jurisdiction of a court is invoked with respect to child custody matters, the statutes kick in and prescribe what issues the court shall decide.

We take the applicable Oklahoma law from *Huffman* and agree that based upon that law there is no due process violation.

 ¶ 43. We also agree with father's second response that mother had actual notice, which, even if legally inadequate, was sufficient to avoid a violation of due process. As the superior court points out, mother was able to file a nine-page motion requesting that issues of custody and child support be bifurcated. She was, therefore, clearly on notice that child support would be discussed. In fact, at the hearing, mother explained, "In that Mr. Pappas raised the issue of support, I had no choice but to address it."

Although this demonstrates only notice that the court would address child support owed *to* her — not child support owed *by* her — we conclude that owing and being owed child support are sufficiently related that the lack of notice concerning the potential imposition of child support does not rise to the level of a due process violation. See *In re Vt. Health Serv. Corp.*, 155 Vt. 457, 460, 586 A.2d 1145, 1147 (1990) ("For notice to be adequate, it is enough 'that the parties be sufficiently apprised of the nature of the proceedings so that there is no unfair surprise.'" (quoting *N. State Tel. Co. v. Alaska Pub. Utils. Comm'n*, 522 P.2d 711, 714 (Alaska 1974))). Examining the record in this case, one can infer not only that mother was not entirely surprised by what transpired but that she likely had an ominous inkling of what the Oklahoma court might do. Furthermore, even if she was not adequately apprised ahead of time, mother definitely had adequate notice to file an appeal. See *Hughes v. Calabrese*, 2002-Ohio-2217, ¶ 14, 767 N.E.2d 725 (holding that collateral attack based on inadequate notice was unavailable because "this claim is usually raised by appeal" and the party "could raise these claims in a postjudgment appeal"). Overall, mother was present, argued lack of notice, and had an opportunity to appeal. See *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272, 130 S. Ct. 1367, 1378 (2010) (holding that receipt of actual notice allowing an opportunity to "timely object[] . . . and appeal[] from an adverse ruling on its objection . . . . more than satisfied [the party's] due process rights"). Under these circumstances, the lack of notice did not entirely frustrate mother's opportunity to be heard and to present her objections.

¶ 44. We also reject mother's second argument — that she received inadequate notice of the July 2000 administrative hearing — as irrelevant to the issues before the court. Oklahoma has an administrative process through which a child support arrearage under a court order can be entered into a judgment, and in this case the father through OCS registered both the court order and the administrative order. The administrative order determined the amount owed from January 2000 through July 2000, and rendered a judgment for that amount combined with the amount of arrearage specified in the court order plus interest. Subsequently, a part of the arrearage was paid through an administrative offset. In its request for enforcement, OCS sought an amount of arrearage that reflected the court order, the administrative order,

the amount paid and an up-to-date calculation of interest. Pursuant to UIFSA, 15B V.S.A. § 606, mother could have contested "the remedies being sought or the amount of any alleged arrearages." She did not do so, instead limiting her challenge to the validity of the Oklahoma orders. In other words, she did not raise a defense under § 607 as to the amount of the arrearage. On this basis, the magistrate found "[t]he parties do not dispute the calculation [of the arrearage]." Mother did not appeal this conclusion to the superior judge or raise any issue of the amount of the arrearage, nor has she raised any issue about it here.

¶ 45. In view of the lack of a contest of the amount of the arrearage, the administrative order is irrelevant to any issue before the superior court or this Court. Even if we assume that the notice of the administrative hearing was inadequate, the order of the administrative agency has no effect on the registration order and child support arrearage judgment issued by the magistrate and affirmed by the superior court judge.

¶ 46. Because we conclude that mother does not have a defense to the registration and enforcement of the Oklahoma child support order, we affirm the decision of the superior court in docket number 2010-398. We remand, however, for proceedings consistent with the final section of this opinion.

IV.

¶ 47. We turn now to mother's appeal from the superior court's denial of her separate attempt to register and enforce the Georgia child support order.[14] Mother contends that, if father is able to register and enforce the Oklahoma order against her in Vermont, then she should be able to register and enforce the Georgia order against him in Vermont. OCS responded on father's behalf, arguing that Vermont lacks personal jurisdiction over father for

---

[14] We recognize that the Oklahoma order purported to find that father was current with his child support obligations. Insofar as we are accepting the validity of that order, it might be thought that the order necessarily eliminated any arrearages potentially owed under the Georgia order. Even if the Oklahoma order were a modification of the Georgia order, but see, *supra*, part I.B., the Oklahoma order could not have removed Georgia's authority to enforce "amounts accruing before the modification." See Ga. Code Ann. §§ 19-11-114, 19-11-171 (1997). We note that this understanding was clearly advanced by father's attorney during the Oklahoma proceeding. On remand, the court is not bound by the alleged findings of the Oklahoma court concerning any arrearages under the Georgia order.

the purposes of collecting child support.[15] The magistrate accepted this assessment, and the superior court affirmed the magistrate.

¶ 48. As we understand mother's petition, there are three components to her child support claim.[16] First, mother alleges that father failed to pay child support under the Georgia order for the period when P.P. was living with father but before father moved to modify custody.[17] Second, mother alleges that father failed to pay support under the order from the date when P.P. moved back to live with mother until he reached the age of majority.[18] Third, mother alleges that father failed to pay the child

---

[15] Mother argued below that OCS is acting outside its statutory authority in making an appearance to argue against jurisdiction over father. The superior court observed that, under 15B V.S.A. § 307(b)(6), OCS has a duty to "notify the petitioner if jurisdiction over the respondent cannot be obtained." We note that OCS has this duty only "upon request," and that the superior court's reading of the statute would imply that OCS is "provid[ing] services to [the] petitioner" in this case by litigating against her. See *id.* We need not decide this question, however, because mother has not pursued it on appeal.

[16] There is actually a fourth component because she alleges that father was supposed to pay as child support a share of any bonuses he paid himself from his business, as shown on his tax return. She claimed that he failed to provide his annual tax return, as required by the Georgia order, so she could not specify how much additional support was due for the bonuses, if any. She sought disclosure of the bonus amounts and further payments based on those amounts.

[17] Mother alleges that father continued to be obligated to pay child support to her for P.P. up until April 2000, the date of the Oklahoma order. Her position appears to be that the Oklahoma court could not make the custody modification, and the extinguishment of father's prospective child support obligation, retroactive to the date of the modification motion. Mother alleges that father failed to pay her child support for P.P. from the date that P.P. moved to Oklahoma in July 1998, up until father moved for modification of custody in April 1999. The Oklahoma court decision found that father was current in payment of child support through July 1998. Mother disputes that father fully paid for July. On remand, the court will have to determine whether the preclusive effect of the 2000 Oklahoma order prevents mother's claim in whole or in part.

[18] She alleges that P.P. moved back to live with her in July 2000 and reached majority fourteen months later. Apparently, custody remained with father under the Oklahoma order. Mother alleges that father paid her no child support for this period. We have generally stated that mother's claims are based upon the Georgia order. It is arguable whether this claim is based on the Georgia order. We also note that part of her first claim involves child support for the period P.P. resided in Oklahoma with father but before custody was changed. Her claim that father owes her child support for this period appears to be inconsistent with her claim that he owes child support for the period in which P.P. returned to live with her.

support amount with respect to the oldest son, A.P., in part of 1996 and for one month in 1998.[19]

¶ 49. Mother's central argument is that, by choosing to register the Oklahoma order in Vermont, father thereby subjected himself to the personal jurisdiction of Vermont. She contends that the Oklahoma order incorporates the Georgia order, that father therefore necessarily registered the Georgia order alongside the Oklahoma order, and that he has therefore waived any objection to personal jurisdiction. Father's argument is that, under UIFSA, mother is required to bring an enforcement action not in her home state but in his home state. The superior court concluded that father was entitled to a limited immunity under UIFSA affording him the ability to petition to enforce child support without submitting to personal jurisdiction "in another proceeding." 15B V.S.A. § 314. Both these arguments are somewhat ironic, of course, insofar as they rely on essentially the same statutory requirements that mother unsuccessfully attempted to avail herself of in Oklahoma.

■ ¶ 50. We conclude the trial court erred in ruling that mother's application could not go further because of lack of personal jurisdiction over father. Two provisions of Vermont's UIFSA potentially establish personal jurisdiction. Section 201 grants personal jurisdiction over a nonresident where "the individual submits to the jurisdiction of this state by consent or by filing with the tribunal a responsive document having the effect of waiving any contest to personal jurisdiction," and also where "there is any other basis consistent with the constitutions of this state and the United States for the exercise of personal jurisdiction." 15B V.S.A. § 201(2), (7). It is well established that initiating a legal proceeding in a state is sufficient to waive any challenge to personal jurisdiction for the purposes of a countersuit. See, e.g., *Adam v. Saenger*, 303 U.S. 59, 67-68 (1938) ("The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence. It is the price which the state may exact as the condition of opening its courts to the plaintiff."). As one court characterized it, "appearing and seeking affirmative relief from the Court is the

---

[19] A.P. reached the age of majority in 1998.

paradigm of such a waiver." *Andros Compania Maritima, S.A. v. Intertanker Ltd.*, 718 F. Supp. 1215, 1217 (S.D.N.Y. 1989).

¶ 51. The waiver of personal jurisdiction here is somewhat complicated by the fact that Vermont OCS has been litigating this case on father's behalf. It was OCS, not father, who filed the request to register the Oklahoma order. UIFSA explicitly fails to resolve whether the relationship between a state enforcement agency and a petitioner constitutes legal representation. See 15B V.S.A. § 307(c) ("This title does not create or negate a relationship of attorney and client or other fiduciary relationship between a support enforcement agency or the attorney for the agency and the individual being assisted by the agency."); see also Official Comment, 15B V.S.A. § 307(c) ("This highly controversial issue is left to otherwise applicable state law."); cf. *McSweeney v. McSweeney*, 159 Vt. 629, 631, 618 A.2d 1332, 1334 (1992) (mem.) ("In URESA proceedings, the state's attorney and obligee do not have a traditional attorney/client relationship; the obligee has no say about what legal action to pursue.").

¶ 52. We need not decide this question. Irrespective of whether the relationship between OCS and a nonresident obligee is one of attorney and client, we hold that father's initiation of the present enforcement action is sufficient to constitute a waiver of personal jurisdiction. Technically, father is the plaintiff in the present action. Furthermore, UIFSA authorizes OCS involvement only "upon request." 15B V.S.A. § 307(a). In this sense, the rationale for finding waiver in the traditional context — namely, that a petitioner has deliberately availed himself of the forum state's courts — applies just as well when litigation is carried out by an enforcement agency that is acting at the request of the petitioner. Finally, UIFSA's limited immunity provision grants immunity for "[p]articipation by a petitioner in a proceeding before a responding tribunal, whether in person, by private attorney, or *through services provided by the support enforcement agency*," presupposing that participation through OCS would waive personal jurisdiction normally. 15B V.S.A. § 314(a); see *Hall v. Tucker*, 2005-Ohio-2674, ¶ 30, 829 N.E.2d 1259 (Ct. App.) ("This legislative grant of limited immunity demonstrates the General Assembly's understanding that, generally, the use of Ohio's courts to enforce a foreign judgment confers personal jurisdiction over the person seeking such enforcement.").

¶ 53. Implicitly accepting that there would otherwise be personal jurisdiction over father, the superior court held that the UIFSA immunity provision prevented finding personal jurisdiction in this case. UIFSA's immunity provision entitles father to appear specially for the purpose of enforcing child support without submitting to personal jurisdiction "in another proceeding." 15B V.S.A. § 314. Father's initiation of this UIFSA proceeding would not, for example, create personal jurisdiction in an unrelated dispute about marital property — the marital property dispute is "another proceeding." See, e.g., *Chaisson v. Ragsdale*, 914 S.W.2d 739, 741 (Ark. 1996) ("UIFSA actions are not intended to open up for renewed scrutiny all issues arising out of a foreign divorce. The purpose of UIFSA is support of the child and enforcement of the same. Other issues such as visitation and payment of debts under the divorce decree are collateral matters which necessarily burden the child support determination and run counter to the goal of streamlining these proceedings."); *Lichtenstein v. Barbanel*, 322 S.W.3d 27, 37 (Ky. 2010) ("There is not room in the UIFSA for litigation of matters collateral to child support or spousal support, such as reimbursement of marital debt. It will simply complicate the issue, as well as hamper the courts' remedies on contempt. Therefore, an order for reimbursement of a marital debt paid is not child 'support' under Kentucky's UIFSA . . . ."). Nor would it create jurisdiction over a dispute over child custody or jurisdiction. See Official Comment, 15B V.S.A. § 314 ("The primary object of this prohibition is to preclude joining disputes over child custody and visitation with the establishment, enforcement, or modification of child support"). The policy of enforcing child support obligations without considering custody or visitation issues started in URESA. See *Hood v. Hood*, 146 Vt. 195, 197, 499 A.2d 772, 774 (1985). The superior court ruled that mother's attempt to raise father's alleged child support arrearage was similarly barred.

¶ 54. We conclude that this determination was incorrect. We hold that the UIFSA immunity provision does not operate to prevent personal jurisdiction over a claim of outstanding child support between the same parties. See *In re Marriage of Haddad*, 93 P.3d 617, 620 (Colo. App. 2004) ("[A] petition for affirmative relief under UIFSA limits the jurisdiction of the tribunal to the boundaries of the support proceeding. But a claim of overpayment of child support is within the boundaries of a

support proceeding . . . ." (citation omitted)); *Largent v. Largent*, 2008 WY 106, ¶ 22, 192 P.3d 130 (holding that husband is entitled to credit for payments made in adjudicating UIFSA enforcement action). That is, we read UIFSA's grant of immunity "in another proceeding" as not including immunity regarding claims of child support that are sufficiently connected with the proceeding initiated by the petitioner. 15B V.S.A. § 314(a). This includes, as here, not only claims involving the same parents and the same child, but also claims involving the same parents and a different child. This reading is based on the understanding that a dispute concerning outstanding support obligations is not a collateral issue, which the official comment describes as "[t]he primary object of this prohibition."[20] Official Comment, 15B V.S.A. § 314.

¶ 55. For two reasons, we conclude that mother's claim in this case is not collateral and therefore that adjudicating it would not involve the kind of proceeding cognized by the immunity provision. First, the child support obligation ultimately exists for the benefit of the child, not the obligee. See 15 V.S.A. § 650 ("The legislature further finds and declares as public policy that parents have the responsibility to provide child support, and that child support orders should reflect the true costs of raising children and approximate insofar as possible the standard of living the child would have enjoyed had the family remained intact."); *id.* § 654 ("The rule shall be based on the concept that children should receive the same proportion of parental income after separation or divorce of their parents as they would receive if their parents were living together in one household."); *C.D. v. N.M.*, 160 Vt. 495, 500, 631 A.2d 848, 851 (1993) ("Although the

---

[20] This is the reasoning of the Colorado Court of Appeals in *Haddad*, which we develop more fully. We do note one court that has apparently come to an opposite conclusion. See *In re Marriage of Grant*, 1998 OK CIV APP 127, ¶ 10, 964 P.2d 963 (holding that mother was immune from personal jurisdiction founded on her contacting state enforcement agency for the purposes of father's attempt to domesticate out-of-state judgment). That court, however, never considered the argument from *Haddad* that competing child support disputes are not covered by the immunity provision. We are not convinced that court would reach the same conclusion if faced with the present arguments. That case was also procedurally distinct. The enforcement agency had not initiated a court proceeding in which the obligee's claims might have been raised as counterclaims; instead, the contact with the enforcement agency would have been used to establish personal jurisdiction in the obligee's offensive action. For these reasons, we do not find this case authoritative here.

court has discretion, the amount of child support should be based on the policy of meeting the needs of the children and having them share in family income."). Even in a case like this where the children have long ago reached the age of majority and only an arrearage is involved, it is important to create the expectation for parents who share an unfair burden of the costs of supporting children that they will be able eventually to obtain reimbursement for the other parent's share of those costs. That expectation inures to the benefit of the children.

¶ 56. In this light, father's obligations under the Georgia order and mother's obligations under the Oklahoma order both relate to the parents' joint duty to ensure that the needs of their children are met. That is, both orders established ways to discharge partially the overarching shared duty to the children. Mother has not paid her share of what was allocated under the Oklahoma order. Mother is entitled to have this failure balanced against previous or later stretches during which father allegedly failed to pay his share and she was forced to pick up the financial slack. Cf. *Louko v. McDonald*, 2011 VT 33, ¶ 11, 189 Vt. 426, 22 A.3d 433 ("[A]llowing the credit should be viewed as permitting payment of arrears from an alternative source . . . ."). This is because, in the broader picture, any dispute over arrearages is a dispute over equitably allocating the burdens of a shared obligation to the child. "[I]t makes more sense, and on balance is fair to both parties, to resolve both matters in the registering court. Support is support . . . and one would reasonably expect to air and resolve all support claims in a single forum." *In re Marriage of Aron*, 274 Cal. Rptr. 357, 363 (App. Ct. 1990). As a result, father's alleged arrearages are not an issue collateral to mother's arrearages — in the way that a separate marital obligation or contractual liability would be — and they are therefore not the subject of "another proceeding" for the purposes of UIFSA's immunity provision.

¶ 57. Second, at least in a case where the only amounts in issue are arrearages, it is in everyone's interest to resolve all related claims in one proceeding in one location.[21] The underlying

---

[21] Perhaps making our hope illusory, we recognize that mother alleges that there is pending in Georgia a separate proceeding initiated by her to obtain an order based on some of the same claims she makes here. As sometimes occurs in appellate review, we are acting based on a record that may have become

purpose of UIFSA is "to cure the problem of conflicting support orders entered by multiple courts." *Brenckle*, 675 N.E.2d at 392. It is wholly inconsistent with this purpose for father to pursue his arrearage in one jurisdiction while mother pursues her arrearage in another jurisdiction. In a controversy where it is likely that the transactional costs have already greatly exceeded the amount in controversy, the need for an efficient, final, and complete resolution is compelling. Thus, the policy considerations behind the limited immunity provision of § 314 are entirely different when we are dealing with disputes over child support arrearages involving the same parents. Introducing other issues into a child support proceeding interferes with the compelling purpose that the children have the protection of a child support order and it is enforced. There is no interference when all issues involve child support.

¶ 58. The discussion above answers the specific holding of the trial court dismissing mother's petition for lack of personal jurisdiction over father. The case must be remanded for consideration of the merits of mother's claims and any other defenses father may have. Since the petition was denied on the very initial issue of personal jurisdiction, there is no record yet for this Court or the trial court to address the strength of mother's claims.

¶ 59. Because the issue will arise on remand, we do address the procedural posture of this case. Mother never raised her claims that father owed her child support until the magistrate issued a decision concluding that the Oklahoma child support judgment against her was valid and enforceable. She first filed her child support petition and her registration of the Georgia order in connection with her request for a stay of the magistrate's order and her notice of appeal of that order to the superior court. Apparently, the magistrate directed that mother's petition be treated as a separate case.

¶ 60. As our discussion above suggests, it is highly desirable that father's claims against mother be involved in the same proceeding as mother's claims against father. It would make no

---

incomplete by the occurrence of events after judgment was reached in the trial court. Thus, the record does not tell us what occurred, or what is likely to occur, in the Georgia case, and mother raised no specific issue on appeal about the effect of action of that court. Since we are remanding, either party is free to show further events in Georgia, and argue the significance of those events, in the remand proceeding.

sense to proceed to coercive collection of father's arrearage judgment while mother's claims are in adjudication and may result in an offsetting or even larger arrearage judgment.

■■■ ¶ 61. Rather than treating mother's petition as opening a separate case, the more desirable course of action for the magistrate was to treat mother's petition as a counterclaim to father's action to register and enforce the Oklahoma order. Although permissive, counterclaims are authorized in family division proceedings. See V.R.F.P. 4(f). By cross-reference, they are allowed in magistrate child support proceedings. *Id.* 8(b). Although raised late, mother's claims could have been allowed as counterclaims by the magistrate and the superior court. See *id.* 4(f); V.R.C.P. 13(f) ("[W]hen justice requires, the pleader may by leave of court set up the counterclaim by amendment."). In these circumstances, we hold that the magistrate should have allowed the claims as counterclaims in father's action. On remand, they should be treated in this way procedurally. Thus, we affirm the dismissal of mother's separate petition, but with the condition that mother can resubmit her claims as counterclaims to father's action.

*The superior court decision in docket number 2011-165 is affirmed. The decision in docket number 2010-398 is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*